Argued and submitted May 6, 2005, judgment of conviction and sentences,
including sentences of death, affirmed in part and reversed in part;
case remanded to circuit court for further proceedings May 18,
reconsideration denied June 27, 2006

## STATE OF OREGON,
*Plaintiff on Review,*

*v.*

## JEFFREY DALE TINER,
*Defendant on Review.*

## (CC 10-95-11814; SC S47643)

135 P3d 305

Mary M. Reese, Bend, argued the cause and filed the briefs for defendant on review.

Janet A. Metcalf, Assistant Attorney General, Salem, argued the cause and filed the briefs for plaintiff on review. With her on the briefs were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Kathleen M. Cegla and Denis M. Vannier, Assistant Attorneys General.

Before Carson, Chief Justice,* and Gillette, Durham, Riggs, De Muniz,** and Balmer, JJ.***

---

* Chief Justice when case was argued.

** Chief Justice when case was decided.

*** Kistler, J., did not participate in the consideration or decision of this case.

RIGGS, J.

**RIGGS, J.**

This case is before us on automatic and direct appeal of defendant's judgment of conviction and sentences of death. We have considered defendant's assignments of error and conclude that the trial court erred only in the form of the judgment. We therefore affirm the convictions and the sentences, but reverse in part and remand this case to the trial court for the limited purpose of correcting the form of the judgment.

## I. FACTS

Because the jury found defendant guilty, we state the facts in the light most favorable to the state. *State v. Thompson*, 328 Or 248, 250, 971 P2d 879, *cert den*, 527 US 1042 (1999). With permission from his California parole officer, defendant traveled to Springfield to visit Eklof in March 1993. Eklof and her three children resided with victim, who had invited them to live with him. After a party at victim's house, defendant and Eklof told victim that they wanted him to leave his house that night. Eklof and defendant argued with and then assaulted victim. By assaulting victim, defendant risked revocation of his parole. Also, in violation of his parole conditions, defendant had acquired a handgun. Defendant killed victim with Elkof's assistance. He disposed of the body in a remote forested area of the Cascade Range.

Despite changes that Eklof and defendant made to the interior of the house after victim's disappearance, such as painting the walls and replacing the carpet, the police found traces of blood in the house. Defendant later boasted to others that he had killed victim and detailed how he had disposed of victim's body. Meanwhile, Eklof participated in four videotaped interviews with police concerning the murder. In May 1994, police arrested Eklof for victim's murder. In November 1994, a mushroom hunter found victim's remains near a logging road in the Cascade Range.

In mid-1994, defendant began serving an unrelated sentence in a Nevada prison. There, he associated with members of a white-supremacist gang, the Aryan Warriors. Defendant's upper body featured various tattoos suggesting sympathy for white supremacy, including a swastika, a

woodpecker, and the words "White" and "Pride." Defendant also used a Nazi symbol, SS lightning bolts,[1] in a letter to his wife.

In December 1995, the State of Oregon indicted defendant for aggravated murder and other crimes relating to the murder of the victim. In August 1996, while still serving his Nevada sentence, defendant was transferred to Oregon. The trial court initially scheduled trial for November 1996, but later granted defendant's motion to postpone the trial until June 10, 1997.

On June 10, 1997, the day set for trial, the state received an adverse ruling concerning the admissibility of Eklof's videotaped statements. The trial court determined that only some of Eklof's statements were admissible as evidence, although the state argued that all four videotapes of her interviews should be admitted in their entirety. In light of the ruling, the state informed the court that it intended to appeal.

On July 7, 1997, the state filed its notice of appeal.[2] There followed a year and a half devoted to settling the record on which the appeal would be based. A few days before the state's opening brief was due, the United States Supreme Court issued an opinion that caused the state's appellate attorney to reconsider whether to proceed with the appeal. *See Lilly v. Virginia*, 527 US 116, 119 S Ct 1887, 144 L Ed 2d 117 (1999) (plurality opinion regarding Sixth Amendment confrontation clause and hearsay exception against penal interest). On July 13, 1999, a little more than two years after filing the notice of appeal, the state moved to dismiss the appeal. The Court of Appeals granted the motion and issued an appellate judgment.

The trial court set a new trial date of April 4, 2000. Late in 1999, defendant moved to dismiss the case for lack of

---

[1] "SS" is an abbreviation for the German term "Schutzstaffel" ("security detachment"), an elite military organization that played a prominent role in the history of Nazi Germany. *See United States v. Zajanckauskas*, 441 F3d 32, 34 n 1 (1st Cir 2006) (explaining term).

[2] Defendant cross-appealed, but the state later successfully moved to dismiss the cross-appeal.

a speedy trial. The trial court issued a written order, supported by findings, rejecting defendant's motion. On April 4, 2000, trial began. A jury found defendant guilty of aggravated murder, among other crimes, and imposed a sentence of death.

Defendant raises numerous issues regarding alleged errors in his trial. We address his constitutional arguments regarding the delays in bringing him to trial, his arguments that the state improperly inspected and photographed his tattoos, and his arguments that the trial court should not have admitted evidence during the penalty phase of his gang affiliations while in prison in Nevada. We have considered defendant's other assignments of error not discussed here, but, based on our review, we conclude that no error occurred as claimed with respect to any of them, except as to the form of the judgment.

## II. TRIAL "WITHOUT DELAY"

■■ Article I, section 10, of the Oregon Constitution provides that "[n]o court shall be secret, but justice shall be administered, openly and without purchase, completely and without delay." In *State v. Harberts*, 331 Or 72, 11 P3d 641 (2000), this court explained that, when examining a speedy-trial question, this court considers the delay and prejudice to the defendant. First, this court examines the length of the delay and the reasons for the delay. *Id.* at 84. Second, the court must assess prejudice to the defendant in light of the interests that the speedy-trial requirement was designed to protect: (1) to prevent oppressive pretrial incarceration; (2) to minimize the anxiety and concern of the criminally accused; (3) and to limit the possibility that the defense will be impaired. *Id.* at 85 (quoting *Barker v. Wingo*, 407 US 514, 532, 92 S Ct 2182, 33 L Ed 2d 101 (1972)). Of those, the last is the most serious, because the inability of a defendant adequately to prepare a case skews the fairness of the entire system. *Id.* In that regard, defendant must show that the delay caused a reasonable possibility of prejudice to the defendant's ability to prepare a defense. *Id.* at 86.

A. *Reasons for Delay*

Defendant argues, and the state concedes, that the length of delay of more than four years between defendant's indictment and trial is constitutionally significant. Defendant focuses on the delay that resulted from the state's decision to appeal the trial court's adverse ruling on admission of Eklof's videotaped statements to the police.

Defendant argues that the state's appeal was not justified for several reasons. First, defendant argues that the state knew at the time that it took its appeal that the admissibility of Eklof's statements hinged on trustworthiness and reliability. The state had argued at Eklof's separate, earlier trial that she was neither trustworthy nor credible. Second, defendant argues that the state knew that its appeal, like the appeal in *Harberts*, was based on a fact-intensive inquiry, which usually offers little chance of success at the appellate level. Third, defendant points out that the state faced a procedurally problematic appeal because it had offered Eklof's multiple statements as a single unit. *See Pumpelly v. Reeves*, 273 Or 808, 812, 543 P2d 682 (1975) (if single offer of proof contains both admissible and inadmissible matter, rejection of entire offer is not error). Defendant also argues that the state unreasonably took more than a year to settle the record before dismissing the appeal. Finally, defendant argues that, whatever the merits of the appeal, the state did not pursue the appeal diligently.

In response, the state argues that it was justified in pursuing its appeal, because the admission of potentially pivotal evidence of defendant's guilt could well depend upon the outcome of the appeal. The state also asserts that it had a reasonable chance of success on appeal and that it was justified in pursuing its appeal because of the seriousness of the offense charged.

We conclude that the state's appeal in this case had little chance of success and, more importantly, that that conclusion should have been obvious to the state's attorneys from the outset of the appeal. At trial, the state insisted that all Eklof's statements must be admitted into evidence and did not make separate offers of evidence. It was all or nothing, according to the state. However, as defendant notes, it is

beyond dispute that some of Eklof's statements were inadmissible. This court long has held that, when a single offer of proof contains admissible and inadmissible evidence, the trial court does not err if it rejects the entire offer. *See Pumpelly*, 273 Or at 812 (so stating). We therefore conclude that the state has offered little justification for the delay.

## B. *Prejudice to Defendant*

We turn to a determination of what, if any, prejudice befell defendant as a result of that delay. Defendant may establish prejudice in three ways: (1) the damage arising from lengthy pretrial incarceration; (2) the anxiety and public suspicion resulting from public accusation of a crime; and (3) the impairment of the defense. *Harberts*, 331 Or at 93. Defendant asserts that he suffered all three forms of prejudice due to the delay that the state caused. In particular, defendant argues that the passage of time affected his ability to attack the state's proof beyond a reasonable doubt in the following ways: (1) Eklof, originally unavailable as a witness because of her asserted right against self-incrimination, completed her trial and appeal, and the state thus gained her as an important witness; (2) a case decided during pendency of appeal, *State v. Goree*, 151 Or App 621, 950 P2d 919 (1997), *rev den*, 327 Or 123 (1998), changed certain rules of evidence and, as a result, the trial court admitted previously suppressed evidence of a telephone conversation between Eklof and defendant; (3) a witness died who might have testified that a gun sold to Eklof (and transferred to defendant) was of a different caliber than the weapon that had killed victim; and (4) witnesses could have testified that defendant had not been involved with prison gangs in Nevada. The first two events merely were fortuitous and do not demonstrate that the passage of time undermined the defense. We need not address them further.

The loss of witnesses is a more serious question. As noted, those witnesses allegedly included (1) a witness who would testify that the gun that defendant obtained from Eklof was a different caliber than the one used in the murder; and (2) other witnesses, specifically two Nevada prison guards, once available to refute defendant's association with white supremacist prison gangs, could not be located for the

April 2000 trial.[3] The value of the missing witnesses was modest, at best. As the state points out, the defense never located the gun-sale witness. The state also asserts that other witnesses were available to testify as to defendant's prison associations and that the two that defendant cited would have provided only cumulative evidence.

We agree with the state that the loss of the missing witnesses did not cause a reasonable possibility of prejudice to defendant's ability to prepare a defense. The gun-sale witness's potential testimony was speculative. The defense never located him and, above all, never determined what he might have had to say. The substance of the prison guards' testimony was available from other witnesses. For example, a retired Nevada prison chaplain testified that defendant had not caused problems and had associated with inmates who avoided trouble. He stated that defendant "was never any particular problem. He was kind of a loner. Just, you know, basically kept to himself and kept out of trouble."

In our view, the state exercised poor judgment in pursuing its appeal; however, we conclude that defendant did not demonstrate that the delay significantly prejudiced the defense of this case. We therefore reject defendant's argument that the case should be dismissed because the state did not afford him a trial "without delay" under Article I, section 10, of the Oregon Constitution.

■ We also reject defendant's argument that the state violated his right to a speedy trial under the Sixth Amendment to the United States Constitution. In addition to the elements discussed above pertaining to defendant's state constitutional claim of lack of speedy trial, defendant acknowledges that a federal claim requires proof of one more factor, namely, that defendant asserted his right to speedy trial. *See Barker*, 407 US at 530 (identifying four factors for federal speedy-trial claim: length of delay, reason for delay, defendant's assertion of right, and prejudice to defendant). Here, we conclude that defendant did not assert his right to a

---

[3] Defendant refers to other witnesses and their allegedly failing memories, but the state correctly observes that defendant failed to preserve all but the arguments set out above.

speedy trial in timely fashion and thus failed to raise that issue under the Sixth Amendment.

## III. INSPECTION AND PHOTOGRAPHY OF DEFENDANT'S TATTOOS

Defendant argues that the trial court erred when it issued an order *ex parte* authorizing the state to photograph tattoos located on defendant's upper body and erred when it permitted the state to use those photographs at trial.

### A. *Background*

In September 1995, defendant was brought to Oregon as a possible witness in Eklof's trial. While in jail, the state informed defendant that it wanted to take pictures of defendant's tattoos. Defendant initially resisted but, after the state informed him that he had no choice, acquiesced to having photographs taken of the tattoos on his upper body. Those photographs were not used at defendant's trial.

In May 1997, the state sought an *ex parte* order permitting the state again to photograph defendant's tattoos.[4] The application was based on a police detective's affidavit. According to the affidavit, the state wanted an expert to examine defendant's tattoos to determine his affiliation with a white-supremacist gang, in connection with the penalty-phase issue of future dangerousness. *See* ORS 163.150(1)(b)(B) (in penalty phase of capital case, jury must consider "probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society"). The state had contacted the chief investigator of the Nevada Department of Prisons, Swann, who previously had testified as an expert on the subject of prison gangs and who was acquainted with defendant from his time in prison in Nevada. Swann indicated, according to the affidavit, that prisoners affiliated with those gangs display tattoos specific to those gangs. In addition, according to Swann, the tattoos may indicate the bearer's criminal history and rank within a gang organization. The detective had provided Swann with

---

[4] Defendant still was serving his Nevada prison sentence, even though he was in the Lane County Jail at that time.

the 1995 photographs of defendant's upper body, but the photographs had provided inadequate detail of defendant's tattoos. The detective had requested defendant's cooperation in photographing his tattoos again, but defendant refused, telling the detective that he would have to obtain a court order. The court granted the order, and the state thereafter obtained new photographs of defendant's upper body. It was this second set of photographs that were admitted into evidence at trial.

Shortly after the state had taken the photographs, defendant's counsel filed an objection and requested a hearing. In particular, defense counsel objected to the *ex parte* nature of the order, arguing that no exigency existed. The state responded that it did not need an order to photograph defendant while in custody. The trial court defended its issuance of the order, observing that it was in the nature of a search warrant and that defendant would have an opportunity to challenge the state's use of the photographs as evidence.

Closer to the date of trial, defendant moved to suppress any unlawfully seized evidence, including the photographs of the tattoos, under his state and federal constitutional rights against unreasonable searches and seizures, and based on the argument that displaying the tattoos to the jury would be unduly prejudicial to him. The state countered that defendant had no privacy interest in his tattoos, particularly when he was in the state's custody. After a hearing, the trial court concluded that the state had the authority to photograph defendant's body while he was in custody.

During the guilt phase of defendant's trial, one witness, who had been present during the party that preceded victim's death, could not make a positive identification of defendant at trial because, according to the witness, defendant's appearance had changed. However, the witness stated that he would be able to recognize defendant based on several distinct tattoos on defendant's upper body, including the words "San Diego," a picture of a bird, and a prison tower. Over defendant's objection, the state introduced photographs of defendant's tattoos, which the witness recognized.

During the penalty phase, the state moved to allow a prison-gang expert, Scott, another investigator from the Nevada Department of Prisons, to inspect defendant's upper body so that he personally could observe defendant's tattoos prior to testifying, because the prior photographs had not been of sufficient quality to permit a definitive statement about the significance of defendant's tattoos. Scott wanted to examine one tattoo, in particular, because he could not discern it from the photographs. The trial court permitted Scott to observe defendant personally outside the jury's presence, with defense counsel present.

Defendant argues that photographing defendant's tattoos pursuant to the court's order violated his right against self-incrimination, his right against unlawful searches and seizures, and his right to counsel. The state disagrees and adds that the error, if any, was harmless.

### B. *Self-Incrimination*

■ Defendant first argues that, in permitting the state's witness to view his tattoos and in admitting the photographs of the tattoos at trial, the trial court violated his constitutional right against self-incrimination. Article I, section 12, of the Oregon Constitution provides that "[n]o person shall be * * * compelled in any criminal prosecution to testify against himself." The Fifth Amendment to the United States Constitution provides that no "person * * * shall be compelled in any criminal case to be a witness against himself." As defendant acknowledges, the state and federal privileges apply to only testimonial evidence—the communication of a person's belief, knowledge, or state of mind—but not to defendant's physical characteristics, such as identity, appearance, and physical condition. *See, e.g., Pennsylvania v. Muniz*, 496 US 582, 590-92, 110 S Ct 2638, 110 L Ed 2d 528 (1990) (physical evidence not subject to Fifth Amendment testimonial privilege); *State v. Fisher*, 242 Or 419, 410 P2d 216 (1966) ("we are unable to find a valid reason for holding that a person whose handwriting has been secured for comparison has had his constitutional right to counsel and privilege against self incrimination invaded"). However, defendant contends that the tattoos in this case carry a communicative content, which the state used to demonstrate defendant's current beliefs and

state of mind. Thus, according to defendant, photographing defendant's tattoos and admitting those photographs into evidence forced defendant to testify against his will.

We disagree for several reasons. Defendant's tattoos identified him and the state used them, in part, to help a witness identify him at trial. This court has held that a defendant may be required to display part of his or her body on request, and such a display does not raise an issue of self-incrimination. *State v. Cram*, 176 Or 577, 582-83, 160 P2d 283 (1945). In addition, the tattoos were preexisting documentary evidence available to the state as part of the discovery process. *See United States v. Hubbell*, 530 US 27, 34-35, 120 S Ct 2037, 147 L Ed 2d 24 (2000) (Fifth Amendment provision against self-incrimination does not apply to documentary evidence created in past or to documents that were not created in response to state compulsion). We therefore conclude that exposure of defendant's tattoos did not constitute compelled self-incrimination.

C. *Lawfulness of Search*

■ Defendant argues that the state's taking photographs of his tattoos amounted to an unlawful search. He makes that argument under Article I, section 9, of the Oregon Constitution ("[n]o law shall violate the right of the people to be secure in their persons") and the Fourth Amendment to the United States Constitution ("[t]he right of the people to be secure in their persons * * * against unreasonable searches and seizures, shall not be violated").

■ Under Article I, section 9, a search occurs when a government agent intrudes into an individual's protected privacy interest. *State v. Meredith*, 337 Or 299, 303-04, 96 P3d 342 (2004). By contrast, the Fourth Amendment protects a person's reasonable expectation of privacy. *Oliver v. United States*, 466 US 170, 177, 104 S Ct 1735, 80 L Ed 2d 214 (1984).

Defendant argues that "[p]hotographing the skin on defendant's upper arms and stomach constitutes a search of defendant's person for it reveals that which is private and not knowingly exposed to the public: the skin underlying one's normal clothing." Defendant does not argue merely that the

state needed a search warrant to photograph his tattoos, but that the tattoos cannot be searched in any manner.

Neither the United States Constitution nor the Oregon Constitution requires a search warrant or its equivalent before the state may take pictures of or inspect defendant's torso because, once defendant became a prisoner, he enjoyed few rights regarding his privacy. *See Hudson v. Palmer*, 468 US 517, 526, 104 S Ct 3194, 82 L Ed 2d 393 (1984) (prisoner does not have subjective expectation of privacy in prison cell); *Bell v. Wolfish*, 441 US 520, 558, 99 S Ct 1861, 60 L Ed 2d 447 (1979) (visual cavity search of prisoner does not violate Fourth Amendment); *Sterling v. Cupp*, 290 Or 611, 620, 625 P2d 123 (1981) ("Those sentenced to prison forfeit many rights that accompany freedom."). Once defendant was imprisoned, he lacked the right to privacy that he enjoyed when he was not in prison. Among the rights that he forfeited was the right to keep his personal appearance including any distinguishing marks such as tattoos—from being known to the state. The state thus reasonably could compel defendant to remove his shirt so that he could be photographed. The state's directive that defendant remove his shirt so that police could photograph his tattoos therefore was not a violation of Article I, section 9, of the Oregon Constitution or the Fourth Amendment to the United States Constitution.

## D. *Right to Counsel*

Defendant next argues that the state's act of photographing his tattoos violated his right to counsel under Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution. Yet, even as he makes that argument, defendant concedes that, "if the hearing on the state's motion was the functional equivalent of an application for a search warrant, then defense counsel need not be present." However, defendant argues that the state's photographing of the defendant was a critical stage of the proceedings, at which counsel must be present, in the same manner as lineups and interrogations.

We disagree. The state's act of photographing defendant constituted the act of collecting preexisting evidence. It

was not a critical stage in the prosecution, such as when identification takes place or testimony is given. *See State v. Classen*, 285 Or 221, 223-24, 590 P2d 1198 (1979) (discussing concept). Collecting and recording existing evidence does not require the presence of defense counsel. *See State v. Jones*, 279 Or 55, 566 P2d 867 (1977) (*ex parte* application for search warrant seeking blood sample from defendant was permissible). The state therefore did not violate defendant's right to counsel when the state took photographs of defendant's torso when defense counsel was not present.

## IV. PENALTY-PHASE EVIDENCE
## OF PRISON GANG AFFILIATIONS

During the penalty phase, the state offered testimony of an investigator from the Nevada Department of Prisons who stated that defendant openly associated with members of the Aryan Warriors at the Nevada prison, that defendant displayed white-supremacist tattoos and used white-supremacist symbols in his written communications, and that the Aryan Warriors had a history of violence. Defendant argued that the state should not have been permitted to present evidence of defendant's beliefs because, among other reasons, defendant's beliefs were not relevant and, even if they were relevant, the evidence was unfairly prejudicial. The state responded that defendant had opened the door for such testimony during the penalty phase and that it was entitled to rebut the testimony of defense witnesses who testified that defendant did not associate with problem inmates in prison.

### A. *Relevance*

■ Defendant argues that his association with a white-supremacist gang was not relevant, because it did not rebut the testimony of defense witnesses that defendant's associations reflected his lack of interest in making trouble or creating problems in the prison. Under OEC 401, "relevant evidence" includes not only evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable," it also includes evidence that has a tendency to make any fact "less probable than it would be without the evidence." Here, there is no question that the evidence was relevant. Defendant offered

evidence that he was a model prisoner and that he was not involved with troublemakers. The state responded to that evidence with the testimony of its expert, who was familiar both with defendant and with gangs in Nevada prisons. The state's rebuttal evidence had some tendency to controvert defendant's evidence of his prior conduct as a prisoner. The evidence related to defendant's gang associations in Nevada thus was relevant to the issues at trial.

## B. *Unfairly Prejudicial*

■ Defendant next argues that the admission of his white-supremacist gang associations was unfairly prejudicial. Defendant asserts that any inference to be drawn to the effect that he was violent because he was seen posturing alongside gang members known for unlawful activity was tenuous, because the state provided no evidence of defendant's involvement with those activities.

We disagree. OEC 403 forbids admission of relevant evidence under certain circumstances:

> "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

Although defendant contends that display and discussion of his tattoos was unfairly prejudicial to him, we observe that the evidence of his gang associations, again, was relevant to defendant's contention that he was a model prisoner. Defendant argues, in effect, that the state was foreclosed from challenging that assertion, because the evidence might reflect poorly on him. Defendant, however, chose to have himself tattooed and to display his tattoos openly with others in prison yard in Nevada, and the state's evidence that he had done so was calculated to refute defendant's own evidence suggesting that he was not involved with prison gangs. The tattoos themselves were thus closely related to the point that the state advanced and were not submitted merely to undermine defendant's character. We conclude that admission of that evidence was not unfairly prejudicial.

## V. ERRORS IN FORM OF JUDGMENT

■ Finally, defendant asks that we address three unpreserved errors in the trial court judgment. The state acknowledges the errors, but argues that they do not require remand to correct the judgment.

First, defendant argues that the trial court erred when it failed to merge count three (intentional murder) into count one or count two (aggravated murder). The jury convicted defendant of aggravated murder as specified in count one and count two of the indictment and intentional murder as specified in count three of the indictment. While the jury was deliberating during the penalty phase, the trial court imposed a life sentence with a 25-year minimum for the jury's conviction for intentional murder under count three of the indictment. The state acknowledged at the time of sentencing that the life sentence should merge into one of the aggravated-murder counts. The final judgment, however, did not merge count three into another count. The state agrees that intentional murder is a lesser-included offense of aggravated murder and that that conviction should have merged with one of the convictions for aggravated murder. Although the state agrees that the error is apparent on the face of the record, the state argues that this court should not exercise its discretion to consider it.[5] The state contends that the court should not exercise its discretion, because the execution of the death sentence will render the mistake moot. We choose to exercise our discretion, however, to order that the trial court correct the judgment to reflect accurately the charges and penalties for which defendant is liable. On remand, the trial court shall merge the intentional murder count into the aggravated murder counts.

Second, defendant argues that the trial court erred when it imposed a sentence of life imprisonment for count three, intentional murder. We need not address that issue,

---

[5] An appellate court may review unpreserved error as plain error if (1) it is an error of law; (2) the error is "obvious, not reasonably in dispute"; and (3) it appears "on the face of the record." *State v. Reyes-Camarena*, 330 Or 431, 435, 7 P3d 522 (2000). In addition, if the error is plain, the court may exercise its discretion to consider the claim of error, but only if it explains its reasons for doing so. *Id.*

because merging count three into another count will render this issue moot.

 Third, defendant maintains that the trial court erred when it entered two convictions for aggravated murder and two sentences of death. Defendant argues that, although the state may charge a defendant with multiple counts of aggravated murder based on the existence of multiple aggravating factors, in the event of multiple guilty verdicts on those counts, the trial court may enter only one judgment of conviction for aggravated murder for each victim, enumerating each of the separate aggravating factors. *See State v. Barrett,* 331 Or 27, 37, 10 P3d 901 (2000) (so stating). Defendant did not object at trial. The state concedes that the judgment is erroneous, because it includes two sentences of death, but argues that execution of the sentence of death will render the issue moot.

The trial court erred when it imposed two convictions and two sentences of death, and that error is apparent on the face of the record. Again, we exercise our discretion to order that the trial court correct the judgment so that it accurately reflects the penalty for which defendant is liable. We remand the case for entry of a corrected judgment of conviction reflecting defendant's guilt on the charges of aggravated murder. On remand, the trial court shall amend the judgment to merge the two convictions for aggravated murder into a single conviction, enumerating separately the aggravating factors on which the conviction was based. *See Barrett,* 331 Or at 37 (so stating). The court then shall impose a single sentence of death. *See State v. Gibson,* 338 Or 560, 578, 113 P3d 423, *cert den,* ＿＿ US ＿＿ , 126 S Ct 760 (2005) (so stating).

## VI. CONCLUSION

We have considered defendant's other assignments of error and every argument made in support of those assignments. Based on our review, we conclude that no error occurred as claimed in any of the assignments of error, including the ones not discussed in this opinion, other than the assignments of error regarding the form of the judgment. Further discussion of those other claimed errors would not benefit the public, the bar, or the bench.

The judgment of conviction and the sentences, including the sentences of death, are affirmed in part and reversed in part. The case is remanded to the circuit court for further proceedings.