Argued and submitted June 29, reversed and remanded November 17, respondent's petition for reconsideration filed November 17, 2010, allowed by opinion February 23, 2011
See 241 Or App 195, _____ P3d _____ (2011)

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## JACOB ALAN HARTMAN,
*Defendant-Appellant.*

Malheur County Circuit Court
08051338C; A140036

243 P3d 480

Louis R. Miles, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Jamie Contreras, Assistant Attorney General, argued the cause for respondent. On the brief were John R. Kroger, Attorney General, Jerome Lidz, Solicitor General, and Michael A. Casper, Assistant Attorney General.

Before Wollheim, Presiding Judge, and Brewer, Chief Judge, and Rosenblum, Judge.*

BREWER, C. J.

* Brewer, C. J., *vice* Carson, S. J.

### BREWER, C. J.

Defendant appeals from his convictions for burglary, ORS 164.215; attempted burglary, ORS 161.405(2)(d); criminal mischief, ORS 164.365; criminal trespass, ORS 164.245; and possession of burglary tools, ORS 164.235. Defendant argues that the trial court erred in denying his motion to suppress evidence obtained following his arrest on an unrelated warrant on the ground that the evidence was obtained in violation of his rights under Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution.[1] In particular, defendant asserts that his rights were violated when an officer entered the holding cell where defendant was lodged, removed defendant's boots, and photographed those boots in order to compare the photograph to a boot print found at a recent crime scene. It follows, defendant reasons, that a search warrant that police later obtained to conduct a second seizure of his boots should not have issued, because that warrant was tainted by an affidavit that relied on the photograph of his boots taken after the first seizure. We reverse and remand.

### I. FACTS

We take the uncontroverted facts from our review of the record, and where the trial court made findings of fact, we are bound by those findings to the extent that they are supported by evidence in the record. *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991). Shortly after midnight on May 24, 2008, Officer Phelps observed defendant acting suspiciously in an area where burglaries had recently taken place. Phelps approached defendant, ascertained his identity, and learned that there was a warrant for defendant's arrest.[2] At some point during the encounter, Officer Bolyard joined Phelps. Phelps arrested defendant pursuant to the outstanding warrant and searched defendant's pockets, finding a putty-knife, screw-driver, wire cutters, and a retractable mirror. Phelps

---

[1] Defendant also assigns error to the trial court's instruction to the jury that it could convict defendant by less than a unanimous verdict. We reject that assignment of error without discussion. *See State v. Bowen*, 215 Or App 199, 168 P3d 1208 (2007), *adh'd to as modified on recons*, 220 Or App 380, 185; P3d 1129, *rev den*, 345 Or 415 (2008), *cert den*, 130 S Ct 52 (2009).

[2] Defendant has not challenged the lawfulness of that encounter.

also found a pair of gloves embedded with glass shards. Phelps placed the seized items on the front seat of his patrol car and transported defendant to the police department, where he placed defendant in a holding cell.

It was the policy of the police department to detain individuals in the holding cell for no more than four hours before transferring them to the county jail. Outside the holding cell was a small room, called the "patrol room," where personal property belonging to individuals lodged in the holding cell would be inventoried pursuant to a police department inventory policy. After Phelps placed defendant in the holding cell, he took the items that he had seized from defendant into the patrol room and placed them on a counter top. Phelps intended to transport those items to the jail with defendant, so that the items could be inventoried under that institution's policy.

Soon after Phelps placed defendant in the holding cell, Bolyard arrived and entered the patrol room. When Bolyard entered that room, the items that Phelps had taken from defendant were still on the counter top, and Bolyard, seeing the tools and the gloves embedded with glass shards, suspected that defendant had been involved in the burglary of a restaurant on May 23, 2008. Bolyard had investigated that burglary and found that someone had opened the electrical circuit box outside the restaurant and tampered with the electrical system, that the telephone box had been opened and tampered with, and that a window had been broken. According to Bolyard, the window appeared to have been broken from the outside, and a partial boot print was found inside the restaurant. Bolyard suspected that defendant had been involved, because the tools taken from defendant were consistent with the kinds of tools that could have been used to tamper with the electrical and phone systems. Moreover, the gloves seized from defendant had glass shards embedded in them, which, in Bolyard's opinion, was consistent with defendant having crawled through the broken window at the restaurant.

Based on the above-described background information, Bolyard asked Phelps to enter defendant's cell, remove defendant's boots, and bring the boots out into the patrol

room so that Bolyard could photograph them. Phelps testified that individuals lodged in the holding cell were allowed to wear their street clothes and that he did not normally remove a detainee's footwear. Phelps nevertheless entered the cell, removed defendant's boots, and brought them out to Bolyard, who then photographed them. Bolyard testified that he had asked Phelps to retrieve defendant's boots because he wanted to photograph them for comparison with the boot print found at the restaurant. Bolyard wanted to photograph the boots at the police department before defendant's transfer to the jail because "we hate to think that something might happen on the way to the jail, but you know, there's always that possibility." Before defendant was transferred to the jail, the officers returned his boots to him. Defendant was then taken to the jail and released later that day.

Four days later, on May 28, 2008, defendant was apprehended near the site of another restaurant burglary and arrested. Defendant was taken directly to the county jail, where his personal property—including his clothing and boots—were taken from him pursuant to that institution's inventory policy. While defendant's clothing and boots were stored in a property locker at the jail, Officer Cooper applied for a warrant to seize defendant's boots from the locker. The affidavit in support of that warrant included the photograph of defendant's boot that Bolyard took on May 24, along with a photograph of a boot print found at an insurance office that had been burglarized on May 14, 2008. The affidavit also included a description of the boots that Deputy Harrison, who had observed the boots while they were in defendant's locker at the jail, gave to Cooper.[3] Cooper averred in the affidavit that, according to Harrison, the boots had " '[t]he original' writing design and a rectangle-type pattern design containing a cross with the words 'oil,' 'fat,' 'alkali,' and 'resistant' printed upon the middle of the sole." The warrant issued and specifically authorized only the seizure of defendant's boots from the property locker. Cooper executed the warrant on May 29, 2008.

---

[3] Defendant has not challenged the lawfulness of Harrison's observation of the boots while they were stored in his property locker.

## II. THE MOTION TO SUPPRESS HEARING

Defendant was indicted for a variety of offenses in connection with the burglary of the insurance office on May 14, 2008, and the burglary at the second restaurant on May 23, 2008. Defendant moved to suppress all the evidence found on his person during both of his arrests, as well as the photograph of his boots taken by Bolyard on May 24.[4] Defendant argued that the warrantless search of his boots on May 24 was not authorized by any exception to the warrant requirements of Article I, section 9, and the Fourth Amendment. Defendant also argued that that search had been conducted as part of Bolyard's investigation of the first restaurant burglary and was not authorized by the police department's inventory policy. Further, defendant argued that, even if the search had been authorized by that policy, the policy was constitutionally deficient because it provided unbridled discretion to the officers. Most importantly, defendant emphasized, there was no provision in the policy that permitted photography of personal property belonging to persons lodged in the holding cell. Accordingly, defendant reasoned, the warrant that Cooper obtained was defective because the supporting affidavit relied on the photograph Bolyard unlawfully took and, without that photograph, the issuing magistrate could not have concluded that there was probable cause to believe that defendant's boots constituted evidence of a crime.

In response, the state argued that defendant's boots would inevitably have been discovered on May 24, 2008, if Bolyard had followed defendant to the county jail instead of photographing the boots at the police department. The state asserted that Bolyard could have taken the photograph at the jail; thus, the circumstance in which he took the photograph while defendant was in the holding cell did not require suppression. The state relied on Bolyard's testimony that, if he had not photographed defendant's boots at the police department, he would have followed defendant to the jail and taken the photograph there, while defendant's personal property was being inventoried. The state also argued that, even if the photograph were excised from the supporting affidavit, that

---

[4] Defendant was not indicted for the burglary of the first restaurant.

affidavit still would have furnished probable cause to issue the warrant to seize defendant's boots.

The trial court denied defendant's motion to suppress. The court first concluded that Phelps's seizure of defendant's boots on May 24, 2008, was unlawful:

> "There is no provision in the [police department's] 'custody search' policy, exhibit 2 that provides for the seizure of the inmate's clothing or shoes. Indeed, the officer testified that the arrestee's shoes were not normally removed as the [police] facility was merely a 4-hour holding facility before the arrestee could be transferred to the [county jail]. Therefore, the seizing and photographing of the defendant's boots on May 24, 2008 constituted an unlawful search."

The court then determined that all references to the photograph should have been excised from the affidavit and that, without those references, the affidavit did not establish probable cause to conclude "that the boot print left at the [insurance office] scene matches the boots worn by defendant on May 28." The trial court found that the photograph of the boot print taken at the insurance office was not sufficiently detailed to allow a match between it and Harrison's oral description of defendant's boots.

Nonetheless, the trial court concluded that the boots would have inevitably been discovered. The court explained:

> "I start by finding that on May 28, 2008[,] Officer Harrison of the [county jail] was properly following [the sheriff's office] general order J7.06 while inventorying defendant's boots after his arrest. * * * I find that on both May 24 and May 28, this policy was in place and was being followed. I find that on May 24, defendant was lawfully arrested on a warrant and that he was lodged in the [county jail]. Under proper, predictable procedures, his boots would have been seized that day. Defendant was released on May 24 and arrested again wearing the same boots on May 28. Officer Bolyard testified that he was familiar with the [county jail] inventory policy * * *[.] Bolyard testified that the boots would have been seized and inventoried * * * on May 24 if he had not seized them at the [police department]. The boots ended up in defendant's personal property locker at [the county] jail on that day. Hence the boots ended up at

the same destination they would have ended up at if the regular [county] inventory policy would have been followed.

"* * * Based on Officer Bolyard's affidavit and testimony on July 15 and based on Officer Phelps'[s] testimony, I find that on May 24, the police had reasonable suspicion and probable cause to believe that defendant was involved in the Burger West burglary and were investigating him for that burglary. * * * Therefore, if the boots had not been seized and photographed at the [police department], Officer Bolyard would have followed defendant to the [county] jail and either examined or photographed the boots during the booking and inventory process. At that point the boots would have been in plain view and Officer Bolyard could have lawfully observed the tread pattern and photographed the boot soles. During the inventory, the boots would have been handled in such a manner that the soles of the boots would have been visible. * * * The observation of the boot soles in plain view during the [county] book-in procedure is a proper and predictable investigation procedure that would have been utilized. I find that the inevitable discovery exception has been proven by the state by a preponderance of the evidence.

"I also find that on May 24, Officer Bolyard would have had probable cause to obtain a search warrant for the boots as evidence of the Burger West burglary. If Officer Bolyard would not have photographed the boots at the [county] jail, he would have sought and obtained a search warrant to seize the boots as evidence of the May 23 Burger West burglary."

Defendant tried his case to a jury and was convicted; this appeal followed.

### III. ANALYSIS

Defendant renews his arguments before this court, focusing on Phelps's seizure of his boots and the use of the photograph taken by Bolyard after that seizure to support the warrant that Cooper obtained. In response, the state argues that the trial court erred in concluding that Phelps's act of taking defendant's boots was a search or a seizure. In any event, the state urges, the trial court correctly found that Bolyard would have inevitably discovered defendant's boots, because Bolyard would have followed defendant to the jail

and would have photographed the boots after they were taken from defendant as part of the jail's inventory process.

█ We first address whether a cognizable seizure of defendant's boots occurred when the officers took them from defendant and photographed them. The state relies on *State v. Tiner*, 340 Or 551, 135 P3d 305 (2006), for its argument to the contrary. In that case, the Supreme Court concluded that the state's act of causing a person incarcerated for a felony to remove his shirt so that his tattoos could be photographed was not a search under Article I, section 9, of the Oregon Constitution. As the court explained, "[o]nce defendant was imprisoned, he lacked the right to privacy that he enjoyed when he was not in prison. Among the rights that he forfeited was the right to keep his personal appearance—including any distinguishing marks such as tattoos—from being known to the state." *Id.* at 563. The court elaborated on that reasoning in *State v. Sanders*, 343 Or 35, 163 P3d 607 (2007), where it once again rejected an argument under Article I, section 9, challenging the requirement in ORS 136.076 that the defendant provide a blood or buccal sample. As the court explained:

> "Similarly, probationers and other conditional releasees who have been lawfully convicted of a felony do not enjoy the full panoply of rights that the general public possesses. * * * [A]t least one permissible restriction on a convicted felon's constitutional rights is permanent, whether that person has been sentenced to a term of imprisonment or to probation: Felony offenders permanently lose their state (and, perhaps, federal) constitutional right to bear arms as a consequence of conviction. * * *
>
> "It follows from the foregoing that ORS 137.076 does not necessarily deprive felony offenders (be they prisoners, persons on supervision, or probationers) of certain of their constitutional rights in general, or of their Article I, section 9, rights in particular, by subjecting them to a specific form of search and seizure *as a consequence of their convictions*."

343 Or at 40-42 (emphasis in original).

The state distills from those cases the principle that "the privacy rights of a person lawfully arrested and waiting to be booked are * * * significantly diminished," and, thus,

Phelps's removal of defendant's boots did not violate any right of defendant under Article I, section 9. We disagree. Both *Tiner* and *Sanders* rest on the theory that an individual *convicted of a felony* forfeits particular rights under the Oregon Constitution, including the right under Article I, section 9, to be free from certain searches and seizures. Here, defendant was not even arrested for a felony, much less convicted of one and, thus, *Tiner* and *Sanders* are inapposite. It follows that the trial court correctly concluded that Phelps's removal of defendant's boots was a seizure under Article I, section 9. Moreover, because the state does not assert that the seizure was authorized by any exception to the warrant requirement, the trial court correctly concluded that the seizure was unlawful.[5]

■ The trial court also correctly excised the photograph of defendant's boots from the affidavit in support of the warrant. When an application includes constitutionally tainted information, the proper remedy is for the magistrate and reviewing court to excise from the application all such information and to determine whether the remaining information is sufficient to establish probable cause. *State v. Hitesman/Page*, 113 Or App 356, 359, 833 P2d 306, *rev den*, 314 Or 574 (1992). In reviewing the sufficiency of an affidavit supporting a warrant, the reviewing court asks whether, based on the facts shown by the affidavit, a neutral and detached magistrate could conclude (1) that there is reason to believe that the facts stated are true and (2) that the facts and circumstances disclosed by the affidavit are sufficient to establish probable cause to justify the requested search. *State v. Villagran*, 294 Or 404, 408, 657 P2d 1223 (1983). "The sufficiency of the search warrant affidavit presents a legal question for *each* reviewing court, *beginning with the trial court*," and, thus, "the question before [this court is] whether the *issuing magistrate* could have concluded that the affidavit (excluding the excised parts) established probable cause

---

[5] The state further argues that the bottom of defendant's boot is similar to a fingerprint and, thus, defendant had a reduced privacy interest in the bottom of his boot. The state relies on ORS 181.511, the statute authorizing the taking of fingerprints by police under certain circumstances, for this proposition. We reject the state's argument because, as the text of ORS 181.511 demonstrates, that statute simply authorizes certain police actions, it does not purport, nor could it purport, to alter the quantum of the privacy right afforded defendant under Article I, section 9.

\* \* \*." *State v. Castilleja*, 345 Or 255, 265-66, 192 P3d 1283 (2008) (emphasis in original). In resolving that question of law, "[n]o appellate court deference to the trial court's findings or conclusions [is] appropriate or warranted." *Id.* at 266.

The affidavit in support of the warrant to seize defendant's boots in this case included a recitation of the circumstances of defendant's arrests on May 24 and May 28, as well as a photograph of a boot print taken at the insurance office and Harrison's oral description of the words imprinted on the sole of defendant's boots. The photograph taken at the insurance office is blurred and shows the tread of the boots, but none of the words or distinctive marks that Harrison identified. Unlike the photograph taken by Bolyard—which clearly shows both the tread *and* the lettering—the photograph taken at the insurance office would not have enabled a magistrate reasonably to conclude that the boot print in that photograph matched the boots that Harrison described, because nothing in Harrison's description identified the tread of the boots, the only feature visible in the insurance office photograph. Accordingly, the trial court did not err in concluding that the affidavit in support of the warrant was insufficient to establish probable cause.

■ We turn, then, to the state's alternative argument that, regardless of the lawfulness of Bolyard's and Phelps's actions, defendant's boots would have inevitably been seized—and photographed—when he was taken to the county jail on May 24. The trial court found that, if Bolyard had not photographed defendant's boots in the holding cell, he would have followed defendant to the jail where the boots would have been plainly visible during an inventory of defendant's personal property. Thus, the court reasoned, Bolyard could have both observed the tread and photographed the boots at that time.[6] Alternatively, the trial court found that, if Bolyard had not photographed the boots when he did, he would have applied for a warrant to do so and that warrant would have been issued. We disagree with both conclusions.

---

[6] The record does not establish whether an inventory of defendant's personal property in fact took place on May 24, 2008.

The "inevitable discovery" doctrine "permits the [state] to purge the taint of illegally obtained evidence by proving, by a preponderance of the evidence, that such evidence inevitably would have been discovered, absent the illegality, by proper and predictable police investigatory procedures." *State v. Miller*, 300 Or 203, 225, 709 P2d 225 (1985), *cert den*, 475 US 1141 (1986). To prevail on an inevitable discovery theory, the state must establish, "by a preponderance of the evidence (1) that certain proper and predictable investigatory procedures would have been utilized in the instant case, and (2) that those procedures inevitably would have resulted in the discovery of the evidence in question." *Id.* at 226. Here, the trial court found that Bolyard would have had an opportunity to observe and photograph defendant's boots when those boots were taken from defendant as part of the inventory of his personal property at the jail on May 24. As we have previously explained, "[t]he purpose of an inventory is to deal with property that properly comes into police custody in a noninvestigatory context." *State v. Guerrero*, 214 Or App 14, 18, 162 P3d 1048 (2007). The police need to determine the nature of the property that they are holding for three principal reasons: (1) protection of the person's property while it is in police custody; (2) reduction or elimination of false claims against the police for lost property; and (3) protection against possible injury from impounded but uninventoried property. *State v. Atkinson*, 298 Or 1, 7-8, 688 P2d 832 (1984). An essential purpose of the limitation on police inventories is to require the police to conduct the inventory "pursuant to a properly authorized administrative program, designed and systematically administered so that the inventory involves no exercise of discretion by the law enforcement person directing or taking the inventory." *Id.* at 10.

In pertinent part, the police department inventory policy provides:

"A. When an inmate is lodged into the [county jail], all personal property including clothing, jewelry, money, etc. will be taken, receipt given and stored.

"* * * * *

"H. Inmate shoes and clothing will be placed in a plastic storage box and stored securely in the Property Room

with restricted access with no inmate access in a well ventilated room. Inmates may release property if the inmate has filled out a property release form."

As we have emphasized, none of the purposes of an inventory identified by *Atkinson* "involves searching for evidence of a crime." *Guerrero*, 214 Or App at 18. Consistently with that principle, nothing in the policy at issue here authorizes the photograph of an inmate's personal property, much less the photograph of such property for purposes of a criminal investigation. Because Bolyard would not have been authorized to photograph defendant's boots as part of the inventory of defendant's personal property, it was not "inevitable" that, following "proper and predictable" procedures, he would have done so. The trial court erred in concluding otherwise.

Ultimately, the state argues—and the trial court agreed—Bolyard could have observed defendant's boots during the inventory because they were in "plain view" and, thus, it was inevitable that Bolyard would have discovered that the boots were evidence pertinent to the first restaurant burglary on May 23. Again, we disagree. As discussed, an inventory is not an investigative search, and using an inventory for such a purpose runs afoul of the constitutional limitations applicable to inventory policies. Bolyard testified, and the trial court found, that Bolyard would have attended the inventory for the purpose of observing the boots as part of his investigation of the first restaurant burglary. Thus, Bolyard would not have been present at that inventory but for the criminal investigation; indeed, Bolyard was employed by the police department, not the county sheriff's office and, thus, he would not have been the official conducting the inventory in any event. It is those facts that distinguish this case from cases where evidence of a crime is lawfully discovered during an inventory of a defendant's personal property. *See, e.g.,* *Guerrero*, 214 Or App at 16 (evidence of crime found during inventory of defendant's personal property upon booking into jail).

The trial court alternatively concluded that, if Bolyard had not asked Phelps to seize defendant's boots in the holding cell, Bolyard would have applied for and obtained a warrant to seize defendant's boots on May 24. The trial

court relied on *State v. Johnson*, 340 Or 319, 131 P3d 173 (2006), for that conclusion. In *Johnson*, police investigators had conducted a warranted search of the defendant's residence on February 28. The affidavit supporting that warrant had not recited facts tying that residence to the defendant's alleged crimes. On March 12, an investigator sought a second warrant to search the defendant's residence and swore out an affidavit that recited many of the same facts as the first affidavit, but also relied on evidence that police discovered during their search of the residence on February 28. During the second search, computers were seized containing evidence that the defendant had researched tide tables in the area near where the victim's body had been found. The defendant moved to suppress that evidence, and the trial court denied the motion, reasoning that

> "the evidence obtained from that search (*i.e.*, the tide table evidence) was admissible because the state had 'purged the taint' of that unlawful search by showing that the tide table evidence inevitably would have been discovered. Specifically, * * *

>> " '[h]ad the * * * computers not been seized, or had the original request for the search warrant been denied, the investigating officers would have subsequently sought a separate search warrant for the house, including a request to seize computers. The execution of a search warrant for the house is a proper and predictable investigation procedure that would have been utilized. * * * The tide chart information from the computer of the defendant would not have been deleted before the seizure of that computer.' "

*Id.* at 327. The Supreme Court affirmed, explaining:

> "Although it is true that investigators *did* refer to observations made during the unlawful February 28, 1998, search when, on March 12, 1998, they swore out an affidavit seeking a second warrant to search the home, *those observations were not necessary to establish probable cause to search the residence or to seize computers from the residence.* There can be no real doubt that, as the evidence showed and the trial court found, even if the police had not performed the February 28, 1998, search at all, they could have, and ultimately would have, produced an affidavit that established

probable cause to search defendant's residence for evidence in Fraser's murder."

(Footnotes omitted; emphasis added.)

As the trial court correctly concluded in this case, without the unlawfully obtained photograph of the boots, Cooper's affidavit would have been insufficient to establish probable cause to seize defendant's boots. *See* 238 Or App at 588. However, the trial court's conclusion that Bolyard had independent probable cause to seize defendant's boots at the holding cell on May 24 and that a warrant would have been issued based on that evidence, is inconsistent with its own conclusion that probable cause was lacking at that time and, indeed, is inconsistent with our conclusion that the trial court was correct in that respect. Unlike the unlawful observations that officers made inside the defendant's residence in *Johnson*, which were not necessary to establish probable cause for the second warrant obtained in that case, here, the unlawfully obtained photograph *was* essential to establish probable cause for the warrant that Cooper obtained to seize defendant's boots. It follows that the trial court erred in denying defendant's motion to suppress.

Reversed and remanded.