Argued and submitted May 14, decision of Court of Appeals reversed; judgment of circuit court reversed, and case remanded to circuit court for further proceedings September 18, respondent on review Michael Santos Castillega's petition for reconsideration filed October 2, allowed by opinion December 18, 2008
See 345 Or 471, 198 P3d 937 (2008)

STATE OF OREGON,
*Petitioner on Review,*

*v.*

AMBER SERENITY CASTILLEJA,
*Respondent on Review.*

(CC CR030092; CA A127255 (Control))

STATE OF OREGON,
*Petitioner on Review,*

*v.*

MICHAEL SANTOS CASTILLEJA,
*Respondent on Review.*

(CC CR030093; CAA127256; SC S055472)

192 P3d 1283

Rolf C. Moan, Assistant Attorney General, Salem, argued the cause and filed the brief for petitioner on review. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Ryan T. O'Connor, Deputy Public Defender, Salem, argued the cause and filed the brief for respondent on review Amber Serenity Castilleja. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Leland R. Berger, Portland, argued the cause and filed the brief for respondent on review Michael Santos Castilleja.

Wayne Mackeson, Portland, filed the brief for *amicus curiae* the Oregon Criminal Defense Lawyers Association.

John C. Lucy IV, Portland, filed the brief for *amicus curiae* the National Organization for the Reform of Marijuana Laws.

GILLETTE, J.

---

* Appeal from Yamhill County Circuit Court, Carol E. Jones, Judge. 215 Or App 235, 168 P3d 1177 (2007).

## GILLETTE, J.

This is a criminal case in which the defendants, who are husband and wife, were charged in a single indictment with unlawful manufacture of marijuana, unlawful possession of a controlled substance (marijuana), and both unlawfully neglecting and unlawfully endangering their two children by permitting them to remain on premises where the alleged illegal acts involving marijuana had occurred. The indictment further charged defendant Michael Castilleja individually with two counts of delivery of a controlled substance (marijuana). The state's case was based on evidence seized pursuant to a search warrant. Defendants moved to suppress that evidence or, in the alternative, to controvert the warrant.[1] The trial judge addressed only the motion to suppress and ruled that the affidavit supporting the search warrant did not supply probable cause to issue the warrant. The state appealed the trial court's resulting order suppressing evidence. A divided Court of Appeals, sitting en banc, affirmed the ruling of the trial court. *State v. Castilleja*, 215 Or App 235, 168 P3d 1177 (2007). We allowed the state's petition for review and now reverse the decision of the Court of Appeals and the judgment of the trial court.

The facts of this case are convoluted but essentially undisputed, at least as they pertain to the issue on review in this court. Oregon State Police Trooper Stone executed the warrant at issue in this case at defendants' home in Yamhill County on October 21, 2002. Defendants both held Oregon "medical marijuana cards"[2] at the time. The affidavit in support of the warrant alleged the following facts, among many

---

[1] Defendants are represented by separate counsel and have not always taken precisely the same legal positions before the trial court, the Court of Appeals, or this court. For the sake of simplicity, however, we choose to label all arguments made, or motions filed, by either defendant as if they had been made and argued by both.

[2] Under the version of the Oregon Medical Marijuana Act (OMMA) in force at the time of defendants' alleged crimes, a person who possessed a "registry identification card"—the document more commonly referred to as a "medical marijuana card"—could lawfully possess up to three mature plants, four immature plants, and one ounce of "usable marijuana" per each mature marijuana plant. ORS 475.306(1) (2001). Under the OMMA, "usable marijuana" was and continues to be defined as "the dried leaves of and flowers of the plant Cannabis family Moraceae, and any mixture or preparation thereof, that are appropriate for medical use as allowed in [other provisions of the OMMA]." ORS 475.302(11). "Usable marijuana" does not include the seeds, stalks and roots of the plant. *Id.*

others: Stone had been a police officer for 12 years. In that time, he had received extensive training in investigating activities related to controlled substances, and he had extensive training and experience with operations for growing marijuana, which familiarized him with the appearance and smell of marijuana, both when growing and in its dried form, as well as in its various stages of processing.

Stone first went to defendants' residence on October 7, 2002, in response to a call concerning an attempted homicide. Officers had been summoned because defendant Michael Castilleja had been shot and seriously wounded by intruders who, it was believed, were attempting to steal defendants' marijuana plants. When Stone arrived, Michael Castilleja already had been transported to the hospital by ambulance, accompanied by defendant Amber Castilleja. Officers already at the scene told Stone that there were six mature marijuana plants growing in a greenhouse on the premises, that there was a "large amount" of marijuana drying in the back of the residence, and that marijuana paraphernalia and loose marijuana were "lying around" the residence. Stone knew that both defendants held medical marijuana permits and that defendants therefore were permitted by law to possess three mature plants each (for a total of six).

Stone entered the house and spoke to Loewen, Amber Castilleja's mother. Loewen told Stone that Amber Castilleja had called her to tell her about the shooting and to ask her to collect the children, ages eight and seven, and to secure the house. Stone's affidavit continued:

> "[Loewen] was very upset and told me she knows [defendants] have medical marijuana permits but added that she knew they were way over their lawful allowable amounts. [Loewen] then said it was her understanding that Michael Castilleja's medical marijuana permit was expired or revoked but she did not know for sure. [Loewen] told me she believed there was a lot more than medical marijuana going on at the Castilleja residence. When I asked her what she meant, [Loewen] said Michael Castilleja has not worked in a couple of years and her daughter works for minimum wage, yet they have lots of stuff. [Loewen] told me there were boxes of brand new stereo equipment stacked in

[defendants'] closet. [Loewen] told me she knows what has been going on because she had once been a drug dealer and was familiar with controlled substances and signs that go along with drug dealing, as well as the effects that drug dealing has on children. [Loewen] told me that she stopped dealing drugs when her children were very young after her daughter was nearly shot during a search warrant service at her home.

"[Loewen] said she knows that [defendants] were not supposed to have more than three ounces of marijuana apiece in addition to the growing marijuana. [Loewen] told me there was two pounds of marijuana in her daughter's bedroom in the closet as well as marijuana all over the house, indicating there was marijuana on the floor and marijuana drying in the back of the residence. [Loewen] told me the two pounds of marijuana in [defendants'] bedroom closet was [*sic*] in two large plastic bags."

After talking to Loewen, Stone walked through the house, observing marijuana and marijuana paraphernalia in various locations.

Stone also averred that he later verified with state officials that both defendants held valid medical marijuana permits.

Stone recounted that he had talked to another police officer, Rosario, who also had talked to Loewen after the shooting. In addition to the information that Loewen had given Stone, Loewen told Rosario about an incident that had occurred over six months earlier, in which defendants and other adults had smoked marijuana in front of the children.

Stone also stated that Rosario had gone back to defendants' home later on the day of the shooting, October 7, 2002, to talk to Amber Castilleja. At that time, Rosario observed that the marijuana that had been growing in the greenhouse a few hours earlier had been harvested and was in three clothes baskets in the house. Those baskets contained stems with the marijuana bud on them, some of which were a foot or more in length. Rosario also observed a box full of bare marijuana stems. Finally, Stone alleged that he knew, based on his training and experience, that the average mature marijuana plant will produce more than a pound of

marijuana and can produce well over a pound depending on the plant and the skill of the grower.

Based on Stone's affidavit, a magistrate issued a search warrant. As noted, police officers executed the warrant on October 21, 2002. While searching the house, the officers discovered and seized marijuana well in excess of the legal limits under the medical marijuana law. Again as noted, defendants were charged in a multicount indictment with, among other things, unlawfully manufacturing a controlled substance, possession of a controlled substance, and delivery of a controlled substance.

Before trial, defendants moved to suppress the evidence obtained as a result of the search of their home. They moved at the same time to controvert the warrant by challenging the good faith, accuracy, and truthfulness of the affiant. At the subsequent hearing on those motions, the trial court ruled that it would consider the motion to suppress first and would turn to the motion to controvert later and only if necessary. Accordingly, the court heard testimony from officers Stone and Rosario, and from Loewen, concerning Loewen's authority to consent to the initial search of defendants' home immediately after the shooting.[3] The court concluded that Loewen did not have authority to consent to that search and, therefore, the magistrate should not have relied on any facts derived from the officers' observations during that initial search to support the warrant that the magistrate ultimately issued.[4]

In light of that ruling, the trial court excised from Stone's affidavit all information derived from the first,

___

[3] The testimony taken at the hearing was consistent with its limited scope. At the suppression hearing, Loewen was asked about her relationship with defendants and their children. She testified that her daughter had asked her to come to the house to collect the children because Michael Castilleja had been shot. She testified that she visited the defendants about once a month and that she did not have a key to their residence. She also testified that she had had conversations with the police after Michael Castilleja had been taken to the hospital. She was not asked about her statements to Stone about the marijuana in the closet or any of her other statements about defendants' drug activity. Officers Stone and Rosario were examined about their contacts with Loewen, but were not asked about any information Loewen had given them about defendants' drug activity.

[4] The state does not challenge that ruling here, and we therefore have no reason to inquire into it.

unlawful search of defendants' home. It then considered the remaining information in the affidavit to determine whether that information was sufficient to establish probable cause to support the issuance of the warrant. In doing so, the court reiterated that it was not taking evidence on or otherwise reaching the motion to controvert.

Having excised the unlawfully obtained information, the court concluded that the remaining allegations did not establish probable cause. First, the court entirely discounted Loewen's statements to Stone:

"[A]s I read the affidavit as a whole, I think that [Loewen] was clearly upset about what she thought was going on.

"She was clearly mistaken in at least one regard, and that was in respect to [Mr.] Castilleja's license being revoked or lapsed. She was just flat wrong about that. And the manner in which she presented the statements and the information that she had, I think painted her as being maybe somewhat less than neutral on the issue. And I do frankly take that into account.

"* * * [The court then summarized Loewen's statements to the effect that defendants were over the legal limit, that there was more than medical marijuana going on, that Michael Castilleja's permit had expired, that she had had her own drug dealing experience, and that defendants had too much 'stuff' considering how little money they earned.]

"I frankly don't find any of her statements there to add anything to probable cause. Again, and I have already mentioned that I think there's an issue of her own motives and veracity, as [defense counsel] pointed out.

"There's some guess work going on. It is too vague. She apparently stated to Detective Rosario [sic] that * * * she felt that it was more than medical marijuana because, one, it was all over the house, and two, she thought that [Michael Castilleja's] card had expired.

"So when she concluded that there was more than medical marijuana going on, I don't find that there was a basis of knowledge or particularly the veracity necessary for me to find that added anything to the probable cause analysis. And I don't find those statements added anything.

"Of somewhat more concern was her statement about the two pounds in the closet. But again, I think that because of the veracity issue, and frankly the basis of her knowledge, and maybe to a lesser extent the issue of whether it was usable or not, I don't find that there is much there either in terms of probable cause."

The trial court then considered the remaining allegations in the affidavit, including, among other things, Rosario's observation that the mature plants had been harvested and amounted to about three pounds of fresh marijuana in baskets, and ruled that those allegations also did not establish probable cause for the issuance of the warrant. Based on those rulings, the court granted defendants' motion to suppress.

The state appealed the trial court's ruling to the Court of Appeals, which affirmed the trial court's suppression of the evidence. However, as we shall explain, the Court of Appeals applied an erroneous standard of review to the trial court's ruling and, in so doing, reached an incorrect result.

Under Oregon law, an application for a search warrant "shall be supported by one or more affidavits particularly setting forth the facts and circumstances tending to show that the objects of the search are in the places, or in the possession of the individuals, to be searched." ORS 133.545(4). A judge reviewing the application and the supporting affidavits shall issue a search warrant if "there is probable cause to believe that the search will discover things specified in the application." ORS 133.555(2). In addition, Article I, section 9, of the Oregon Constitution, provides that "no warrant shall issue but upon probable cause, supported by an oath, or affirmation, and particularly describing the place to be searched, and the person or thing to be seized."

In a typical search warrant case, such as this one, the issuing magistrate or judge reviews an affidavit—a document—and does not hear live witness testimony.[5] Therefore,

---

[5] Rather than rely on the affidavit alone, the issuing magistrate or judge may hold a hearing and examine the affiant and the informants. ORS 133.555(1). In that case, the magistrate or judge may make factual findings, and a reviewing court would be bound by those findings as well as all reasonable inferences to be

the only question before the issuing judge or magistrate is a legal one: Does the affidavit establish probable cause? And probable cause, in this context, exists when the facts set out in the affidavit would " 'lead a reasonable person to believe that seizable things will probably be found in the location to be searched.' " *State v. Goodman*, 328 Or 318, 325, 975 P2d 458 (1999) (quoting *State v. Anspach*, 298 Or 375, 380-81, 692 P2d 602 (1984)).

■      When a court reviews a challenge to the sufficiency of an affidavit supporting a magistrate's issuance of a warrant, the question before the reviewing court remains a legal one. A reviewing court asks whether, based on the facts shown by the affidavit, a neutral and detached magistrate could conclude (1) that there is reason to believe that the facts stated are true; and (2) that the facts and circumstances disclosed by the affidavit are sufficient to establish probable cause to justify the search requested. *State v. Villagran*, 294 Or 404, 408, 657 P2d 1223 (1983). In this case, after having ruled that the initial search of defendants' home was unlawful and therefore having excised the parts of the affidavit that contained information derived from that search, the trial court concluded (erroneously, as we shall explain) that (1) there was insufficient reason to believe that Loewen's information was true; and, (2) with Loewen's statements excised, the remaining facts and circumstances described in the affidavit were not sufficient to establish probable cause to search.

        On appeal, however, the Court of Appeals did not apply that standard of review. Rather, the court held as follows:

        "Our standard of review dictates our conclusion. When, as here, the trial court has excised information from the affidavit, that court resolves the sufficiency of the warrant independently of the decision of the magistrate who issued the warrant and, thus, on appeal, there is no occasion for deference to the issuing magistrate's decision. * * * *In other words, like the trial court, we are not required to draw all*

---

drawn from them that are consistent with the magistrate's or judge's ultimate conclusion.

*reasonable inferences that are consistent with the magistrate's decision. Instead, we are bound by the trial court's factual findings, including reasonable inferences that it drew, as long as there is evidence to support them.* \* \* \* 'Normally, in the absence of other indications of the trial court's findings, we resolve all disputed factual issues to support its ultimate conclusion.' \* \* \* 'On appeal, we do not decide whether we would draw the same inference if we were the factfinder. We ask only whether that inference is one that the trial court reasonably could draw based on the record before it.' \* \* \* Thus, when, as here, the trial court has determined that a search warrant application does not establish probable cause, we are bound by the court's factual findings and all reasonable inferences that are consistent with that conclusion.

"In reaching the ultimate conclusion that the affidavit did not demonstrate probable cause, the trial court necessarily determined that the affidavit failed to show that defendants probably had more than six ounces of usable marijuana in their home. We are bound by that determination if any evidence in the record supports it. \* \* \*"

*Castilleja*, 215 Or App at 248-49 (citations omitted; emphasis added).

■ As is evident from the foregoing, the Court of Appeals felt obligated to uphold the trial court's determinations regarding the truth of the information in the affidavit and the existence of probable cause if there was any evidence to support them. That was incorrect. The sufficiency of the search warrant affidavit presents a legal question for *each* reviewing court, *beginning with the trial court*. That is, as in the trial court, the question before the Court of Appeals was whether *the issuing magistrate* could have concluded that the affidavit (excluding the excised parts) established probable cause to search defendants' home. As to that question, the Court of Appeals was in the same position as was the trial court to evaluate the sufficiency of the facts alleged in the affidavit, the reasonableness of any inferences involved in resolving the legal question presented by the probable cause determination, and, ultimately, the existence of probable

cause to support the warrant. No appellate court deference to the trial court's findings or conclusions was appropriate or warranted.[6]

It follows that the same legal question is before this court on review: Does the affidavit (excluding the excised parts) provide sufficient information to permit the issuing magistrate to find probable cause for the search?

To answer those questions, we turn to the first issue that *Villagran* (and the cases that have followed it) requires us to decide: whether the magistrate reasonably could believe that the facts stated in the affidavit are true.[7] In *Villagran*,

---

[6] In this case, the trial court relied on in-court testimony to conclude that the initial warrantless entry was unlawful. The trial court's factual findings supporting that ruling are entitled to deference on review. That is, with respect to the facts that the trial court relied upon to support its decision to excise certain facts from the affidavit, the Court of Appeals, as the reviewing court, is bound by the trial court's findings of fact, if there is evidence in the record to support them. *State v. Johnson*, 335 Or 511, 523, 73 P3d 282 (2003); *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). That, however, does not affect the standard of review that the trial court, or the Court of Appeals, was required to apply in reviewing the *remainder* of the affidavit for probable cause. Rather, those courts were required to evaluate the sufficiency of the affidavit based on the remaining accurate allegations in the affidavit after excision. *See, e.g., State v. Harp*, 299 Or 1, 9, 697 P2d 548 (1985) (describing process).

[7] Although the trial court expressly stated that it would not decide defendants' motion to controvert the warrant under ORS 133.693 unless and until that became necessary, there appears nonetheless to have been some confusion among the parties and in the Court of Appeals as to whether the trial court, in deciding that Loewen's statements should be discounted because she lacked veracity, was directly or implicitly deciding that motion as well. The trial court could not have done so on that stated basis under the plain wording of ORS 133.693. That statute provides that, in a motion to controvert, a party may "contest, by cross-examination or offering evidence, the good faith, accuracy and truthfulness *of the affiant* with respect to the evidence presented to establish probable cause for search or seizure." ORS 133.693(1) (emphasis added). This court has held on numerous occasions that that statute only permits a party to challenge the good faith, accuracy, or truthfulness of an *affiant*, not that of an *informant*. Illustrative cases are *State v. Esplin*, 314 Or 296, 839 P2d 211 (1992); *State v. Coffey*, 309 Or 342, 788 P2d 424 (1990); and *State v. Hitt*, 305 Or 458, 753 P2d 415 (1988). (And, in this case, defendants' motion to controvert challenged only the affiant's (Stone's), and not the informant's (Loewen's), good faith, accuracy, and truthfulness.) Thus, under ORS 133.693, if Stone subjectively believed that Loewen was truthful, and if that belief was objectively reasonable, then defendants could not controvert the warrant even if Loewen was later proved to have acted in bad faith in providing information to the police. *See Esplin*, 314 Or at 304-05 (stating principle). However, the fact that defendants may not controvert a warrant under ORS 133.693 by attempting to show that an informant lacked veracity does not relieve the reviewing court of its obligation to determine from the four corners of the affidavit whether a magistrate reasonably could believe that the facts set out in the affidavit are true.

this court reviewed various factors that a court may consider in reviewing a magistrate's determination of the veracity of a person who had provided information to the police. First, the court considered the connection of the informant to the crime itself. According to the court,

> "[a]t the one extreme is the participant in the criminal activity who, for a variety of reasons, decides to become an 'informer' in the second dictionary sense—one who informs against another, often for money or for other reward or gain. Then there is the person who, though not a party to the crime, is closely connected with the criminal establishment. A third category would include witnesses, including victims. A fourth category would include other persons unconnected with the crime who provide information, the significance of which the provider may or may not be aware. Courts have held that persons in the latter two categories may be more worthy of belief than an informant from the criminal establishment. *See State v. Montigue*, 288 Or 359, 605 P2d 656 (1980); *United States v. Harris*, 403 US 573, 91 S Ct 2075, 29 L Ed 2d 723 (1971). Identification of the informant by name may also be a factor to consider."

294 Or at 409-10. In *Villagran*, the informant was not complicit in the crime, and his information did not accuse the defendant of a crime. However, the court observed, nothing in the affidavit directly established the informant's veracity. Accordingly, the court stated, the informant's veracity would have to inhere in the circumstances of the inquiry. Having considered those circumstances, the court concluded that the magistrate reasonably concluded that the informant was truthful. *Id.* at 411-12.

■ In this case, Loewen was not complicit in the crime, but might be said to be closely connected to the criminal establishment, at least insofar as she is related to the defendants. However, we think that the issuing magistrate would have been entitled to infer that her status as such enhanced her credibility, because her statements were against the criminal interests of her own daughter. Loewen also was identified by name, which tends to enhance her credibility. In addition, Loewen's statements about her own experience dealing drugs, together with her knowledge of defendants'

income level and acquisition of valuable property, lent credibility to her conclusions concerning the likelihood that defendants also were dealing drugs. Finally, Loewen's statements reflected a familiarity with the medical marijuana laws and limits, which provided a basis for her asserted knowledge that defendants possessed more marijuana than the medical marijuana law permits. All those factors reasonably permitted the magistrate to conclude that Loewen was truthful. Still further, Loewen's information about the marijuana and stereo equipment in defendants' bedroom closet was very specific, which supported an inference that that information was based on first-hand knowledge.

As noted above, the trial court came to a contrary conclusion with respect to the information that Loewen provided to Stone. Of particular relevance to the trial court was the fact that Loewen stated that she believed that Michael Castilleja did not hold a valid medical marijuana permit. According to the trial court, Loewen was "flat wrong" about that, and that fact, coupled with the fact that Loewen was clearly upset about what had happened at her daughter's house, caused the trial court to doubt Loewen's veracity in every respect.[8] As our recitation of the part of Stone's affidavit recounting his conversation with Loewen shows, however, Loewen did not simply state that she believed that Michael Castilleja's permit was invalid; she added that *she did not know for sure.*" (Emphasis added.) Instead of suggesting that Loewen was not credible, the issuing magistrate was entitled to infer from that equivocal admission of uncertainty that Loewen was concerned with providing accurate information to the police. At the least, no necessary inference can be drawn from that statement that Loewen lied to the police, an inference which then might have required the magistrate to find that Loewen was not credible.[9] Moreover, nothing in

---

[8] As noted, nothing presented at the suppression hearing reflected one way or another on Loewen's veracity. The evidence presented at that hearing was confined to the subject of Loewen's authority to consent to the search of defendants' home.

[9] We say "might" because, even in the context of a motion to controvert under ORS 133.693, evidence that an affiant made an inaccurate statement, in the absence of evidence that the affiant actively lied, is not a sufficient reason to disregard the affiant's other statements. *See State v. Keeney,* 323 Or 309, 319, 918 P2d 419 (1996) ("A demonstration that an affiant has supplied inaccurate information in a search warrant affidavit furnishes no reason for the court to conclude that the

Stone's affidavit supports the inference drawn by the trial court that Loewen had improper motives in making her statements to the police. While the fact that Loewen was upset that her son-in-law had been shot and that his and her daughter's criminal activities had placed her grandchildren in danger may show that Loewen was not "neutral," as the trial court stated, it certainly was a natural response to events, and it did not require the issuing magistrate to question, much less reject, Loewen's credibility.

It follows from the foregoing that the trial court erred in concluding that it was permitted to make its own independent findings that the information that Loewen had supplied was not truthful or reliable, and that the Court of Appeals erred in affirming that methodology and conclusion. We so hold.

That leads us to the second issue that *Villagran* requires us to decide, *viz.*, whether the facts and circumstances disclosed by the affidavit were sufficient to establish probable cause to justify the search. 294 Or at 408. Both the trial court and the Court of Appeals concluded that those facts and circumstances were not sufficient. In that regard, the Court of Appeals held that, even if the trial court's conclusion that Loewen lacked veracity were not reasonable, "the trial court could reasonably determine that the affidavit failed to establish that the marijuana in the closet probably was usable." *Castilleja*, 215 Or App at 251. Similarly, the Court of Appeals upheld the trial court's conclusion that none of the other allegations in the affidavit established that a search probably would uncover more than six ounces of usable marijuana. Again, the Court of Appeals focused on the wrong question, which led it to apply an incorrect standard of review: Rather than considering the legal issue whether the affidavit alleged sufficient facts to permit a neutral and detached magistrate to determine that seizable evidence probably would be found at the place to be searched, the court accepted all the *trial court's* findings as true, as long as there was evidence in the record to support them. Because the

---

affiant's remaining factual assertions also are inaccurate, in the absence of some showing to support that conclusion. By contrast, a demonstration that the affiant *lied* to the magistrate may lead the trial court to conclude that the affiant is not credible and that it should give no weight to the affiant's other statements.").

Court of Appeals applied the incorrect standard in reviewing the trial court's ruling, we consider the matter anew.

■ Preliminarily, we agree with the Court of Appeals that the issue in the case is not whether there was probable cause to believe that *any* marijuana would be found in defendants' house but, rather, whether there was probable cause to believe that *an unlawful amount* of marijuana—more than six usable ounces—would be found there. With the unlawfully obtained information excised from the affidavit, but with due consideration to Loewen's statements, the affidavit permitted the issuing magistrate to find the following facts: Loewen knew that defendants were "not supposed to have more than three ounces of marijuana apiece in addition to the growing marijuana"; Loewen reported that "there [were] two pounds of marijuana in her daughter's bedroom closet as well as marijuana all over the house" and that "there was marijuana on the floor and marijuana drying in the back of the house"; Loewen stated that the two pounds of marijuana in defendants' bedroom closet were in two large plastic bags; and, finally, Stone stated that medical marijuana permit holders each are permitted to possess up to three ounces of usable marijuana, defined as the dried leaves and flowers of the marijuana plant and, based on his training and experience, he had reason to believe that evidence of the crimes of, among other things, manufacturing a controlled substance and possession of a controlled substance would be found in defendants' home.

■ We turn to the question whether a neutral and detached magistrate could conclude, based on the facts and circumstances shown by the affidavit, that there was probable cause to believe that the search would discover things specified in the affidavit in the places requested to be searched. *Villagran*, 294 Or at 408. In so doing, we also consider all "inferences that fairly may be drawn from those facts" to determine whether probable cause exists. *Goodman*, 328 Or at 326. We further observe, in that connection, that "[p]robable cause is not certainty; 'there is a vast difference between proof of probable cause and proof of guilt * * *.' " *Id.* (quoting *State v. Tacker*, 241 Or 597, 601, 407 P2d 851 (1965)). Thus, to uphold the warrant, the reviewing court need only conclude that the issuing magistrate reasonably

could conclude that the facts alleged, together with the reasonable inferences that fairly may be drawn from those facts, establish that seizable things *probably* will be found at the location to be searched. We think that the affidavit here was more than sufficient to meet that standard.

Apart from Loewen's statements that marijuana was "all over the place," Loewen specifically stated that there were two pounds of marijuana in plastic bags in defendants' closet. Although that statement alone does not directly convey how much, if any, of that marijuana was "usable," we think it is fair to infer that the marijuana in the plastic bags was dry, if for no other reason than because it was in the closet rather than being dried in the back of the residence. It also would be fair for the magistrate to infer that bags containing 32 ounces of dried marijuana—even if all of it was not usable marijuana—would at least contain more than six ounces of marijuana that was usable. The issuing magistrate also might have drawn a number of other inferences in support of probable cause, but we think that it is sufficient for the purposes of this case to hold that the foregoing inferences, standing alone, were sufficient to supply probable cause to justify the search requested.

To summarize, we hold that the facts that Stone recounted in his affidavit, together with reasonable inferences drawn therefrom, would permit a neutral and detached magistrate to believe that seizable things probably would be found in defendants' home. Indeed, taken together, all the facts and the inferences that reasonably could be drawn from those facts would have permitted the issuing magistrate reasonably to conclude that this affidavit was replete with probable cause. The trial court erred in reaching a contrary conclusion, and the Court of Appeals erred in affirming that ruling.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to the circuit court for further proceedings.