Submitted August 27, 2008, affirmed July 1, 2009

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# JASON MICHAEL WEST BAYER,
*Defendant-Appellant.*

## Multnomah County Circuit Court
060342557; A134518

211 P3d 327

Peter Gartlan, Chief Defender, and Erica Herb, Deputy Public Defender, Legal Services Division, Office of Public Defense Services, filed the brief for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Sally L. Avera, Senior Assistant Attorney General, filed the brief for respondent.

Before Landau, Presiding Judge, and Ortega, Judge, and Carson, Senior Judge.

LANDAU, P. J.

LANDAU, P. J.

Defendant was convicted of driving under the influence of a controlled substance (DUII-CS), ORS 813.010.[1] On appeal, he assigns error to the trial court's denial of his motion to suppress an incriminating statement made in what he contends were compelling circumstances before he received *Miranda* warnings. He also challenges the court's failure to dismiss the charges against him for lack of a speedy trial. And he assigns error to the court's decision to admit expert testimony by a drug recognition expert (DRE) regarding his administration of the so-called DRE protocol, on the ground that the final step of the protocol—the toxicological testing of defendant's urine—was, in defendant's view, inadequate. We reject all of defendant's arguments and affirm.

## I. FACTS

The relevant facts are undisputed. On June 28, 2005, City of Gresham Police Officer Ozeroff—who was on traffic patrol on a motorcycle—pulled defendant over for speeding and making an improper lane change. Ozeroff had also seen the passenger in the back seat toss a lighted cigarette out of the car. Once Ozeroff contacted defendant, he asked to see defendant's driver license, which defendant admitted was suspended. Ozeroff believed that defendant was under the influence of some sort of intoxicant, but he had not been certified to administer the DRE protocol. Bryant, the back seat passenger who had thrown the lighted cigarette, admitted that there was a warrant out for his arrest.

Ozeroff called for backup. He requested that a patrol car respond to the scene to take Bryant into custody. He also requested that Officer Durbin respond to the scene to evaluate defendant's sobriety; unlike Ozeroff, Durbin was certified to administer the DRE protocol, which is a method used by law enforcement officers to ascertain whether a person is

---

[1] ORS 813.010 provides, in part:

"(1) A person commits the offense of driving while under the influence of intoxicants if the person drives a vehicle while the person:

"* * * * *

"(b) Is under the influence of intoxicating liquor, a controlled substance or an inhalant[.]"

under the influence of a controlled substance. Ozeroff also intended to have the car that defendant was driving towed. At that point, only a couple of minutes had passed since Ozeroff pulled over defendant.

The patrol car arrived before Durbin did. Once Ozeroff placed Bryant inside the patrol car, Ozeroff had defendant get out of the car for field sobriety testing. Defendant's eyes were glassy and bloodshot; he was also jittery and making rapid movements. When Ozeroff asked him why his eyes were red, defendant attributed it to the fact that he had just come from work. Ozeroff asked defendant what time he got off work, and defendant replied, "5 o'clock." After Ozeroff noted that it was not yet 5:00 (it was 4:45), defendant said that he got off a few hours early that day. Defendant's heart was pounding so hard during the conversation that Ozeroff could see it beating through defendant's shirt.

Ozeroff then conducted two field sobriety tests. During a horizontal gaze nystagmus test, defendant's eyes did not have difficulty tracking as would be indicative of alcohol intoxication, although Ozeroff was suspicious of the rapid and constant eye movement. During the next test, a strabismus test, defendant had difficulty holding both eyes in a crossed position. Although Ozeroff did not believe that defendant was inebriated, he suspected that defendant was under the influence of some sort of controlled substance. Approximately five minutes had passed since Ozeroff called Durbin. Ozeroff later could not recall whether he told defendant that he was required to wait at the scene for Durbin to arrive. At no point did Ozeroff give defendant *Miranda* warnings.

Durbin arrived a minute or two after Ozeroff completed his field sobriety testing. Durbin immediately observed defendant's red eyes and rapid movements. When he asked defendant how much marijuana he had smoked that day, defendant replied that he had "smoked a bowl" an hour or two ago. When Durbin asked him to rate his sobriety on a scale of one to 10 (with a "one" being completely sober), defendant said "two." Defendant also stated that he was paranoid and that his heart was pounding.

Durbin then administered another field sobriety test—the walk-and-turn test—which defendant failed. In

Durbin's mind, "there was no doubt * * * at that point that [defendant] was impaired to operate a vehicle." Durbin arrested defendant for DUII and gave him *Miranda* warnings.

At the police station, defendant took a breath test, which disclosed a .00 percent blood alcohol content, conclusively ruling out alcohol as the cause of defendant's apparent intoxication. Durbin then conducted the remaining steps of the 12-step DRE protocol. During that process, Durbin observed many indications that defendant was under the influence of at least one controlled substance. Based on his observations, Durbin concluded that defendant was incapable of safely operating a vehicle and that he was under the influence of marijuana and a central nervous system stimulant. To corroborate his opinion, Durbin requested a urine sample from defendant for toxicological testing. (The results of the testing later confirmed that defendant's urine contained metabolites of both marijuana and cocaine, which is a central nervous system stimulant.) Durbin released defendant after citing him for DUII-CS.

Defendant appeared three weeks after the incident for his scheduled court appearance—on July 18, 2005, a Monday. Because the circuit court does not conduct arraignments on Mondays, however, the citation was dismissed. Defendant was aware that he might be recharged.

Eight months later, on March 16, 2006, the state filed a misdemeanor information for DUII-CS pertaining to the June 2005 incident. Defendant was arraigned and appointed counsel on July 11, 2006. A diversion eligibility hearing was scheduled for August 3, at which point defendant requested a setover until August 24. On August 24, defendant declined diversion, and his trial was scheduled for November 8. The state later requested a setover, and defendant's trial was rescheduled to December 13.

In the meantime, defendant filed a motion to suppress his statement that he had "smoked a bowl" of marijuana shortly before the traffic stop, among other evidence that is not at issue in this appeal. He alleged that his statement was a response to police questioning in compelling circumstances that required *Miranda* warnings.

On December 13, the parties appeared for trial and for a hearing on defendant's motion to suppress. At that point, defendant moved to dismiss the charges against him for lack of a speedy trial—a motion that the court denied. Regarding the suppression motion, the state presented evidence as to the events we have described; Ozeroff testified, and the parties stipulated to the contents of Durbin's police report. Defendant advanced two arguments in support of his motion to suppress. First, he argued that Ozeroff unlawfully arrested him by requiring him to wait several minutes for Durbin to arrive after concluding that defendant had not been consuming alcohol—an argument that he does not reassert on appeal. Second, he argued that that detention, coupled with the fact that Ozeroff had questioned him about the redness of his eyes and conducted field sobriety tests, constituted compelling circumstances, thus warranting *Miranda* warnings prior to questioning by Durbin. The trial court rejected those arguments, concluding that the evidence of defendant's intoxication, including his incriminating statement, was obtained during a "typical DUII investigation." The court denied defendant's suppression motion in its entirety.

Defendant was then tried to a jury. Ozeroff's trial testimony was largely the same as his testimony at the suppression hearing. Durbin also testified. He first testified as to his qualifications as a DRE-certified police officer and as to how he administered the protocol and recorded the results. He then testified as to his observations of defendant made during his administration of the protocol and as to his opinion that defendant was under the influence of two controlled substances.

Refalo, the toxicologist who conducted the chemical analysis of defendant's urine at the Oregon State Police (OSP) forensic laboratory, also testified. He stated that, when conducting a urinalysis, the lab—which is an accredited forensic laboratory—performs both a screening test and a confirmatory test. If both of those tests agree, he explained, the result is reported as either negative or positive. He commented that the lab conducts no quantitative testing of urine, stating that the lab views such analysis as "misleading or

useless" to determine a person's impairment at the time the sample is collected. Refalo stated, however, that the screening test is "semi-quantitative," in that the level of a substance must meet a specified threshold—a "cutoff level"—to register as positive for that substance. The cutoff level used by the OSP lab for marijuana metabolites is lower than that specified by the National Institute for Drug Abuse (NIDA) of the United States Department of Health and Human Services. In other words, under Oregon's cutoff level, a screening test could be positive for marijuana metabolites while the same quantity would register as negative under the NIDA guidelines. Refalo also testified that the OSP lab's cutoff level for detecting cocaine metabolites in the screening test is the same as the NIDA guidelines.

Defendant objected to the testimony of Durbin and Refalo and agreed to defer argument until after the testimony was completed. Outside the presence of the jury, defendant argued that, because the urinalysis had not been conducted according to NIDA testing standards, the testimony of Refalo and the whole of Durbin's DRE testimony were inadmissible. The court overruled the objection. Defendant then moved to strike the DRE evidence and for a mistrial based on the admission of that evidence. The court denied those motions. Ultimately, the jury convicted defendant of DUII-CS, and this appeal ensued.

## II. DISCUSSION

On appeal, defendant advances five assignments of error. First, he contends that the admission of his statement that he had "smoked a bowl" of marijuana shortly before the traffic stop violated his constitutional rights against self-incrimination. He also contends that the trial court should have dismissed the charge against him on statutory and constitutional speedy trial grounds. Defendant's remaining three assignments relate to the court's admission of the DRE evidence; he contends that the court should have excluded the evidence because the state failed to lay a proper foundation. We address each of his arguments in turn.

## A. *Self-incrimination*

We turn first to defendant's contention that the court should have suppressed his roadside admission of marijuana use one or two hours before the traffic stop. He argues that admitting that statement violated his rights against self-incrimination under the Oregon and United States constitutions.

■ We begin with defendant's state constitutional argument. Article I, section 12, of the Oregon Constitution provides, in part, that "[n]o person shall be * * * compelled in any criminal prosecution to testify against himself." Under that provision, police may not question a person who is in "full custody" or subjected to "compelling" circumstances without first giving *Miranda* warnings. *State v. Roble-Baker*, 340 Or 631, 638, 136 P3d 22 (2006); *see also State v. Magee*, 304 Or 261, 264-66, 744 P2d 250 (1987) (identifying Article I, section 12, as a source independent of the federal constitution that requires police to give a defendant *Miranda*-type warnings).

■ Defendant does not contend that he was in "full custody"; instead, he contends that he made his incriminating statement while subjected to "compelling" circumstances. In determining whether circumstances are "compelling," we consider the totality of the circumstances to ascertain "whether the officers created the sort of police-dominated atmosphere that *Miranda* warnings were intended to counteract." *Roble-Baker*, 340 Or at 641. Some of the factors involved in such an inquiry include the location and length of the encounter between the police and the suspect, the amount of pressure exerted on the suspect, and the suspect's ability to terminate the encounter. *Id.* at 640-41. Another factor is whether, during the encounter, the police confronted the suspect with evidence of his or her illegal behavior and used that evidence in a coercive manner. *State v. Shaff*, 343 Or 639, 650, 175 P3d 454 (2007). A minimal level of restraint, without more, does not constitute compelling circumstances. *Id.* at 647.

In arguing that he was subjected to compelling circumstances, defendant relies on the following facts: the car

that he was driving was going to be towed; a second officer responded to arrest a passenger in the car; he was subjected to field sobriety tests and to questioning about the redness of his eyes; and he was "forced to wait for Durbin to arrive to conduct further [field sobriety tests]." He places particular importance on Durbin's question about recent marijuana use, which, in defendant's view, constituted an accusation of "illegal" behavior. He notes that "Durbin did not ask defendant *if* he had smoked marijuana, only how much." (Emphasis in original.) According to defendant, "[i]t is common knowledge that marijuana is an illegal substance and that smoking it is a crime." "By asking defendant how much marijuana he had smoked," defendant argues, "Durbin implied that he already knew that defendant had smoked marijuana, and thus, committed a crime." Defendant contends that, given all of those circumstances, a reasonable person would have felt compelled to answer Durbin's question and confess to illegal behavior. Accordingly, defendant concludes, his incriminating statement should have been suppressed.

■ We disagree. Defendant's roadside interaction with Ozeroff amounted to a routine traffic stop. Ozeroff pulled over defendant after observing him commit two traffic infractions. He immediately suspected that defendant was intoxicated, warranting further investigation regarding defendant's sobriety. Defendant voluntarily answered Ozeroff's questions and voluntarily participated in field sobriety testing. Although backup officers arrived at the scene, the patrol car was there to take Bryant into custody on an outstanding arrest warrant. Defendant was never subjected to questioning by more than one police officer at a time; when Durbin arrived, he relieved Ozeroff of the task of further evaluating defendant's sobriety. Even if Ozeroff detained defendant for a short period of time before Durbin arrived, Ozeroff's DUII investigation was ongoing. Although Ozeroff thought that the cause of the intoxication was likely not alcohol, he testified that he believed that defendant was under the influence of a controlled substance. In fact, he summoned a DRE officer to the scene to conduct that particular inquiry. We readily conclude that those circumstances were not "compelling" in

the constitutional sense. *See State v. Prickett*, 324 Or 489, 497, 930 P2d 221 (1997) ("[T]he administration of lawful field sobriety tests does not, without more, create a 'compelling' setting as a matter of law, thereby requiring that *Miranda*-like warnings always precede questioning after the completion of the tests.").

The fact that the phrasing of Durbin's question implied that he suspected that defendant had been smoking marijuana does not undermine our conclusion. Defendant was free not to answer the question, and the record does not reflect that Durbin's questioning was anything but brief and to the point. We conclude that Durbin's question did not alter the dynamics of a routine DUII investigation in a sense that has constitutional significance in this case.

Because the circumstances in this case do not rise to the level of custody or compelling circumstances that require *Miranda* warnings, admitting defendant's incriminating statement did not violate Article I, section 12.

We also reject defendant's argument under the Fifth Amendment to the United States Constitution, which provides, in part, that "[n]o person shall be * * * compelled in any criminal case to be a witness against himself." Under that provision, a person must be given *Miranda* warnings when subjected to "custodial interrogation," and statements obtained in violation of that right are inadmissible. *Miranda v. Arizona*, 384 US 436, 444, 86 S Ct 1602, 16 L Ed 2d 694 (1966). "Custodial interrogation" means that the suspect's freedom has been limited in "any significant way." *Id.* Ordinary traffic stops, however, do not require that a suspect be given *Miranda* warnings, even when he or she is subjected to field sobriety tests and roadside questioning. *Pennsylvania v. Bruder*, 488 US 9, 10-11, 109 S Ct 205, 102 L Ed 2d 172 (1988); *Berkemer v. McCarty*, 468 US 420, 441-42, 104 S Ct 3138, 82 L Ed 2d 317 (1984).

In conclusion, the record demonstrates that this case involves a routine traffic stop and that the field sobriety testing and questioning were part of a routine DUII investigation. The United States Supreme Court has held that such circumstances do not constitute "custodial interrogation" that triggers the requirement for *Miranda* warnings.

Although defendant makes a bare assertion that he "was subjected to custodial interrogation," he does not attempt to distinguish this case from *Berkemer* or *Bruder.* We reject defendant's Fifth Amendment argument without further discussion.

The trial court did not err in denying defendant's motion to suppress.

B. *Speedy trial*

■ We turn then to defendant's contention that the trial court should have dismissed the charge against him for lack of a speedy trial, on both statutory and constitutional grounds. When a defendant raises speedy trial challenges on statutory and constitutional grounds, a court typically considers the constitutional challenge first because the remedy for a constitutional violation (dismissal with prejudice) is more complete than the remedy for a statutory violation (dismissal without prejudice). *State v. Johnson,* 342 Or 596, 606, 157 P3d 198 (2007), *cert den,* ___ US ___ , 128 S Ct 906 (2008). When the statute of limitations has run, however, the difference between those remedies has no practical effect. In those cases, it is appropriate to consider the statutory argument first. *State v. Forsyth,* 220 Or App 476, 482, 188 P3d 299 (2008).

In this case, the time has passed during which the state could recharge defendant with DUII-CS for the June 2005 incident. Accordingly, we turn first to his statutory challenge.

1. *ORS 135.747*

■ Defendant's statutory argument is based on ORS 135.747, which provides:

"If a defendant charged with a crime, whose trial has not been postponed upon the application of the defendant or by the consent of the defendant, is not brought to trial within a reasonable period of time, the court shall order the accusatory instrument to be dismissed."

For purposes of that statute, a court calculates the delay in bringing the defendant to trial from the time when he or she stands "charged with a crime"—that is, the period during

which "the prosecutor has the power to move the case forward." *State v. Johnson*, 339 Or 69, 93, 116 P3d 879 (2005). The court subtracts from that total any periods of delay consented to or requested by the defendant. *Id.* at 95; *State v. Garcia/Jackson*, 207 Or App 438, 444, 142 P3d 501 (2006).

■ If the remaining delay "exceeds expectations" for bringing the defendant to trial on the particular type of charge, the court must determine whether the delay was nevertheless "reasonable" given the "attendant circumstances." *Johnson*, 339 Or at 88. The Oregon Standards of Timely Disposition, adopted by the Oregon Judicial Conference in 1990, "are informative in determining the length of time that is 'reasonable' in which to bring a case to trial." *State v. Emery*, 318 Or 460, 471 n 17, 869 P2d 859 (1994). Those standards recommend that 90 percent of all nonfelony cases should be resolved within 90 days, 98 percent within 180 days, and 100 percent within one year. *Id.*

■ In this case, the parties disagree about the length of the delay in bringing defendant to trial because they begin the speedy trial "clock" at different starting points. Defendant argues that the starting point is the day of the original citation, that is, June 28, 2005. His trial began approximately 17 months later (excluding a 20-day setover that he requested), a delay that he contends was not "a reasonable period of time." According to the state, because the original citation was dismissed, the appropriate starting point for calculating the delay is the date of the subsequently filed information, that is, March 16, 2006. Defendant's trial began nine months later (including the 20-day setover requested by defendant), which, the state contends, is a reasonable delay for purposes of ORS 135.747.

■ We agree with the state that the information filed on March 16, 2006, is the appropriate starting point for calculating the delay. Directly on point in that regard is our decision in *State v. Purdom*, 218 Or App 514, 180 P3d 150, *rev den*, 345 Or 159 (2008). In that case, we held that, when the state dismisses one charging instrument but subsequently files another, the prosecution commences with the second charging instrument and, thus, serves as the starting point for calculating the relevant delay for purposes of ORS 135.747. *Id.*

at 516-18, 523. Accordingly, the period of delay, for statutory speedy trial purposes, is nine months.

We also agree with the state that defendant was brought to trial after that within a "reasonable period of time." Twenty days of the nine-month delay was for a setover requested by defendant and, thus, must be subtracted from the total amount of the delay. Even assuming that a delay of approximately eight months exceeds expectations for bringing a defendant to trial on a misdemeanor (under the aspirational standards, 98 percent of nonfelonies should be adjudicated within six months), we conclude that the delay was "reasonable" for purposes of ORS 135.747, given that the delays were relatively routine. *See Garcia/Jackson*, 207 Or App at 446-47 (concluding that, although 14 months was longer than would be expected to bring the defendant to trial on two misdemeanor charges, the delay was not unreasonable for purposes of ORS 135.747). In fact, defendant does not contend that, if the state's starting point is correct, the resulting delay was unreasonable. We reject defendant's statutory speedy trial argument.

## 2. *Article I, section 10*

■■ We turn then to defendant's state constitutional speedy trial argument. Article I, section 10, of the Oregon Constitution provides, in part, that "justice shall be administered, openly and without purchase, completely and without delay." Speedy trial claims under Article I, section 10, "are guided by considering the length of the delay and, if it is not manifestly excessive or purposely caused by the government to hamper the defense, the reasons for the delay, and prejudice to the defendant." *State v. Harberts*, 331 Or 72, 88, 11 P3d 641 (2000). Although it is only one of three factors, the length of the delay is a "triggering mechanism"—that is, "[i]f the time taken to bring an accused to trial is substantially greater than the average, inquiry into the remaining two factors is triggered." *State v. Mende*, 304 Or 18, 23-24, 741 P2d 496 (1987). Conversely, "manifestly excessive" delays and those deliberately caused by the state to impede the defense are presumed prejudicial, regardless of the other two factors. *State v. Ivory*, 278 Or 499, 505-06, 564 P2d 1039 (1977).

 Stated differently, in the absence of a presumptively prejudicial delay, a defendant must demonstrate actual prejudice to warrant the extreme remedy of dismissal of charges. *See Mende*, 304 Or at 24-25. A court

> "assess[es] prejudice to the defendant in light of the interests that the speedy-trial requirement was designed to protect: (1) to prevent oppressive pretrial incarceration; (2) to minimize the anxiety and concern of the criminally accused; (3) and to limit the possibility that the defense will be impaired. Of those, the last is the most serious, because the inability of a defendant adequately to prepare a case skews the fairness of the entire system. In that regard, [the] defendant must show that the delay caused a reasonable possibility of prejudice to the defendant's ability to prepare a defense."

*State v. Tiner*, 340 Or 551, 555, 135 P3d 305 (2006), *cert den*, 549 US 1169 (2007) (citations omitted).

 As an initial matter, the parties disagree about which event—the original citation issued on June 28, 2005, or the information filed on May 16, 2006—triggered defendant's right to trial "without delay" in this case. The Supreme Court has held that, for purposes of Article I, section 10, "an official action that is sufficient, standing alone, to commence a prosecution starts the running of the 'without delay' clock." *State v. Vasquez*, 336 Or 598, 610, 88 P3d 271 (2004). Whether a charging instrument that was later dismissed "commenced" a prosecution for constitutional speedy trial purposes, is unclear. *Compare State v. Siegel*, 206 Or App 461, 464-65, 467, 136 P3d 1214 (2006) (evaluating the delay in bringing the defendant to trial from the date of the initial charging instrument, even though it was later dismissed and the defendant recharged), *with State v. Olstad*, 218 Or App 524, 529-30, 180 P3d 114 (2008) (noting that the Supreme Court's opinion in *Vasquez* lends support for both positions, but determining that it made no difference to the ultimate conclusion whether the court counted from the first or the second charging instrument).

This case does not present the opportunity to make such a clarification. Even if defendant is correct that the original citation triggered his right to a trial "without delay," we

conclude that, on the facts of this case, defendant's speedy trial rights were not violated by the 17-month delay.

Defendant does not argue that we should conclude that the 17-month delay was long enough to be considered presumptively prejudicial; he does not contend that it was "manifestly excessive" or deliberately caused by the state to impair his ability to prepare a defense. Instead, he argues that the delay is "substantially greater than usual" for a misdemeanor and that the factors, when considered together, weigh in favor of dismissal. In defendant's view, the delay was unexplained and prejudiced him in two ways: He asserts that, during the period of time after dismissal of the original citation and before the filing of the information eight months later, he worried and was anxious about whether he would be recharged. He also asserts that Ozeroff's faded memory regarding whether he expressly told defendant to wait for Durbin to arrive to conduct further field sobriety tests impeded his arguments in support of his motion to suppress.

Even assuming that the delay was "substantially greater than the average," we readily conclude that defendant has not demonstrated sufficient actual prejudice to warrant dismissal. The record contains no information about any anxiety beyond that expected when someone is, or might be, the subject of a criminal charge. Further, defendant has not established that Ozeroff's allegedly faded memory "caused a reasonable possibility of prejudice to [his] ability to prepare a defense," *Tiner*, 340 Or at 555. Even if Ozeroff had testified definitively that he told defendant to wait for Durbin to arrive, it could not have had a bearing on the success of defendant's suppression motion. We have already determined that the brief detention was part of the ongoing DUII investigation. Accordingly, defendant has not established a speedy trial violation under Article I, section 10.

3. *Sixth Amendment*

██ ██ Defendant also asserts that he was entitled to dismissal of the charge against him under the Sixth Amendment to the United States Constitution. The Sixth Amendment provides, in part, that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." In assessing a claim under that provision, a court

considers the three factors relevant to the state constitutional analysis (length of the delay, reasons for the delay, and the prejudice that results from the delay) and also the defendant's diligence in asserting the right to a speedy trial. *Barker v. Wingo*, 407 US 514, 530, 92 S Ct 2182, 33 L Ed 2d 101 (1972). As with the state constitutional analysis, the length of the delay is a "triggering mechanism"—that is, "[u]ntil there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Id.*

██ ██ We begin by noting that the relevant delay for our Sixth Amendment analysis is different from that for the state constitution. Unlike Article I, section 10, "the Speedy Trial Clause [of the Sixth Amendment] has no application after the Government, acting in good faith, formally drops charges. Any undue delay after charges are dismissed, like any delay before charges are filed, must be scrutinized under the Due Process Clause, not the Speedy Trial Clause." *United States v. MacDonald*, 456 US 1, 7, 102 S Ct 1497, 71 L Ed 2d 696 (1982). Accordingly, given that defendant's original citation was dismissed on July 18, 2005 (and defendant does not contend that the state did not act in good faith in doing so), and he was under no charges until the state filed its information on March 16, 2006, the relevant delay for Sixth Amendment purposes is from the date of the information to his trial nine months later.

██ Defendant does not assert that a nine-month delay violated his Sixth Amendment speedy trial rights. Even assuming that such a delay triggers consideration of the remaining factors, we have already concluded that defendant has not demonstrated any prejudice. Moreover, defendant was less than diligent in asserting his right to a speedy trial given that he waited until the day of trial to do so. *Barker*, 407 US at 530.

The trial court did not err in denying defendant's motion to dismiss on Sixth Amendment grounds.

## C. *Admissibility of DRE protocol evidence*

As we have noted, defendant's remaining assignments pertain to the trial court's admission of Durbin's testimony regarding his administration of the DRE protocol and Refalo's testimony about the urinalysis results. Defendant assigns error to the court's decisions to overrule his objection to the admission of the testimony and to deny his subsequent motions to strike and for a mistrial. He argues that the state failed to lay a proper foundation for the admission of the testimony and that, accordingly, it should have been excluded.

The DRE protocol "is a 12-step procedure performed by a trained officer that purports to determine whether a subject is under the influence of a controlled substance." *State v. Sampson*, 167 Or App 489, 491, 6 P3d 543, *rev den*, 331 Or 361 (2000). We have described those steps as follows:

"1. A blood alcohol content (BAC) analysis is done. If the subject's BAC exceeds 0.08 percent, the DRE protocol ends.

"2. The DRE officer interviews the arresting officer to elicit information about the subject's behavioral and physical symptoms.

"3. The DRE officer conducts a preliminary physical examination: he or she checks the subject's eyes for synchronization and pupil size, checks the pulse, and asks general health questions. This step determines whether the subject is impaired by a medical condition.

"4. The DRE officer conducts four standard eye examinations developed to detect intoxication: horizontal gaze nystagmus (HGN), vertical gaze nystagmus (VGN), and lack of convergence (LOC).

"5. The DRE officer conducts four FSTs [field sobriety tests]: the Romberg balance test, the walk and turn test, the one leg stand test, and the finger to nose test.

"6. The DRE officer checks the subject's pulse, blood pressure, and body temperature.

"7. The DRE officer measures the subject's pupil size under three light conditions (near total darkness, indirect

light, and direct light), and inspects the nose and mouth for signs of drug ingestion.

"8. The DRE officer checks the subject's muscle tone for extreme flaccidity or rigidity.

"9. The DRE officer inspects for injection sites.

"10. The DRE officer conducts a focused interrogation and observation of the subject's behavior.

"11. Considering the results of all the foregoing procedures, the DRE officer develops a formal opinion identifying the drug that the subject took.

"12. The DRE officer obtains a urine sample for toxicological testing. The test is used to corroborate the DRE officer's opinion and to provide a learning tool for the officer."

*Id.* at 494-95 (citing NHTSA, "Drug Evaluation and Classification Training Student Manual," at IV-3 to IV-22 (1993)) (internal footnotes omitted); *see also* OAR 257-025-0012(3) (noting the existence of the same).

In *Sampson*, we concluded that the procedure and results of the DRE protocol are admissible as scientific evidence in a DUII-CS prosecution to show that a defendant was under the influence of a controlled substance. 167 Or App at 512. We noted, however, that the state still must establish, in each case, that the DRE officer was properly qualified to administer the protocol, that the officer administered it properly, and that the results were accurately recorded. *Id.* Subsequent to our decision in *Sampson*, we held that "an incompletely administered DRE protocol is not, itself, admissible as scientific evidence." *State v. Aman*, 194 Or App 463, 473, 95 P3d 244 (2004), *rev dismissed as improvidently granted*, 339 Or 281 (2005).

In this case, defendant does not challenge Durbin's qualifications as a DRE officer, his administration of the protocol, or the recording of the results. Instead, defendant focuses only on the final step, that is, the urinalysis. Even then, he does not challenge the collection or handling of the urine sample; he challenges only the propriety of the OSP lab's testing standards. According to defendant, our approval of the use of DRE evidence in *Sampson* was conditioned on the statutory testing standards in effect at the relevant time

in that case. *See* ORS 813.131(4) (1997) ("The detection levels and results of urine tests given under this section shall conform to rules and guidelines of the National Institute of Drug Abuse [NIDA] of the United States Department of Health and Human Services."). Defendant asserts that the legislature has since changed the provision in the implied consent statute that governs urine testing and that that change makes our decision in *Sampson* inapplicable. Or Laws 1999, ch 752, § 1 (amending ORS 813.131(4) to read as follows: "A chemical analysis of a person's urine under this section shall be performed in an accredited or licensed toxicology laboratory."). In defendant's view, because the test was not conducted in accordance with the NIDA guidelines (at least as to screening for marijuana metabolites), "the DRE protocol was not conducted in the manner that this court deemed admissible in *Sampson*." Accordingly, defendant asserts, the state failed to lay the proper foundation for admissibility of that testimony, and the trial court erred in concluding otherwise. Such evidence, defendant contends, was not harmless.

The state disagrees that our conclusion in *Sampson* as to the admissibility of DRE evidence was conditioned on the NIDA testing standards for the urinalysis. The state notes that, although we determined the urinalysis to be an important part of the scientific reliability of the DRE protocol—in that it provides an objective confirmation of the DRE officer's subjective observations—we never specified any particular testing standards. In any event, even if *Sampson* is inapplicable in this case, the state contends that it "independently established that the urinalysis testing conducted by the OSP crime lab was scientifically valid and reliable." The state agrees with defendant that, if it was in fact error to admit the DRE evidence, such error was not harmless.

We agree with the state that there was no error in this case. Our conclusion in *Sampson* as to the admissibility of DRE evidence in a DUII-CS prosecution did not rely on the NIDA testing standards. In fact, ORS 813.131 is not referred to in our opinion in that case. We expressly stated that assessing a particular step of the protocol was beyond the scope of our inquiry in that case: "We emphasize that [the] defendant does not challenge the weighing of individual steps

of the protocol in this case but, rather, presents only the question of whether the DRE protocol is, *in general*, admissible." *Sampson*, 167 Or App at 493 (emphasis in original).

■ Thus, we conclude that the state, having introduced Durbin's testimony as to his DRE certification and how he administered the protocol and recorded the results, fulfilled the foundational requirements specified in *Sampson*. As we have noted, defendant does not argue that the state failed to lay a foundation in any other way. Our conclusion renders the state's assertion that it established a foundation independent of *Sampson*'s requirements a moot point.

Because the DRE evidence was properly admitted, the trial court's denials of defendant's motion to strike and of his request for a mistrial—based only on defendant's contention that the DRE evidence should have been excluded—were not erroneous. We reject defendant's last three assignments of error.

Affirmed.